No. 94,416

STATE OF KANSAS, *Appellee*, v. MARC VINCENT SAPPINGTON, *Appellant*.

(169 P.3d 1107)

Opinion filed November 2, 2007.

*Sarah Ellen Johnson,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jerome A. Gorman,* district attorney, argued the cause, and *Paul J. Morrison,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Marc Vincent Sappington directly appeals his convictions of first-degree felony murder and attempted aggravated rob-

bery. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

Approximately 2 months before these convictions, Sappington was also convicted of crimes arising out of a different episode: three counts of first-degree murder, one count of kidnapping, and one count of aggravated burglary against four different victims. His appeal from those convictions is the subject of *State v. Sappington*, 285 Kan. 158, 169 P.3d 1096 (2007).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the prosecutor commit reversible misconduct during closing argument? No.

2. Did the district court err in denying Sappington's motion for change of judge? No.

3. Did the district court err in admitting certain autopsy photographs into evidence? No.

4. Did the district court err in denying Sappington's requests for new counsel? No.

Accordingly, we affirm the district court and convictions.

## FACTS

David Mashak owned and operated Phase One Auto Sales, a detail and auto sales shop located in Kansas City, Kansas. On March 5, 2001, Mashak sold a 1984 Chevy Impala to A.G. for $750. Mashak's wife, Valerie Mashak, testified that in early March she accompanied Mashak to the shop when Mashak showed A.G. the car. Valerie testified that when Mashak sold the car to A.G., Mashak told A.G. to park the car because the "tags weren't right." Two days after the sale Police Officer Jason Allen stopped the Impala being driven by A.G. because the 30-day tag was altered. Due to the altered tag, Allen had the car towed to the impound lot. According to Valerie, on approximately March 10 A.G. called Mashak at home, complaining about his car being towed and asking Mashak to get it out of the impound lot.

On March 16, 2001, Mashak and Johnny Sublett, Mashak's employee and best friend, were eating lunch in the business' office around 2 p.m. when an African-American male entered the busi-

ness. Mashak and Sublett were the only individuals in the shop at the time. Sublett did not know this individual; he was later identified as A.G. According to Sublett, A.G. was angry and spoke to Mashak about getting the vehicle that Mashak had sold to A.G. out of the impound lot. Mashak did not pay attention to A.G.; he continued eating his lunch. A.G. then walked out of the shop.

As soon as A.G. walked out, a different man wearing a black mask and a black Carhartt or Dickie coat with a hood entered the shop. Sublett did not recognize this individual either. The man, later identified as Sappington, was carrying what Sublett described as a black AK assault rifle. As soon as Sappington entered, he started shooting. When Sublett saw the gun, he ran into the garage portion of the business and dived under a vehicle. From there, he could hear Mashak getting shot in the office and fleeing to the garage. After approximately 10 minutes, Sublett crawled out and called an ambulance. Mashak was lying on the garage floor, conscious, but dying.

Richard Turner, a customer at Loud and Clear Car Audio across the street, heard the gunshots and then saw one African-American male running out of Mashak's shop and another African-American male shooting into it. Turner and Donald Martin, the owner of Loud and Clear Car Audio, then saw two men speed away in a brown vehicle. According to Martin, a "hooded person" was driving the vehicle.

Police found Mashak and eight shell casings inside the shop. Officer Kim J. Crockett testified that AK-47 assault rifles and SKS assault rifles fire the caliber of ammunition found in the building. Seven of the shell casings were found in the office and one on the garage floor. The officers also found several bullet holes in the interior walls of the shop and in some of the vehicles parked in the garage.

Dr. Donald Pojman, the forensic pathologist who performed the autopsy, testified that Mashak suffered five gunshot wounds—two to the left shoulder, one to the right elbow, and two to the right side of the chest. Dr. Pojman opined that Mashak died from multiple gunshot wounds, most importantly the gunshot wound to the chest, with loss of blood the ultimate cause of death.

The next month an anonymous tip led officers to investigate Sappington as a participant in the shooting. He eventually confessed to his participation in the crime. Sappington stated that A.G. approached him about helping recover money from Phase One Auto Sales because the guys there had sold A.G. a car that had been towed because the "tags weren't right." He characterized himself and A.G. as "associates" prior to this incident. According to Sappington, A.G. said he would go into the shop first and talk to the owner and then Sappington was supposed to enter 6 seconds later as an "enforcer."

Sappington stated that his role was to hold a gun on the individuals to make sure they cooperated; there was no plan to shoot them. With a black scarf covering his face, he entered the shop and pointed the SKS rifle at the two men sitting behind the counter. Because they "quickly moved" and Sappington thought they were reaching for a gun, he shot them. He then ran out of the shop, and he and A.G. fled in a brown vehicle.

A pager registered to A.G.'s father was found at the scene which had independently led officers to investigate A.G. as a suspect. From a photo lineup, Sublett identified A.G. as the person who entered the shop on the day of the shooting, and Valerie Mashak identified him as the person who bought the car from her husband and who had called about getting it out of the impound lot. A.G. eventually confessed to his participation in the crime and implicated Sappington as the shooter.

The case against Sappington was continued a number of times over 3 years because of periods in which he alternated between competency and incompetency. Sappington was evaluated primarily by Dr. William S. Logan, a psychiatrist, who met with Sappington 13 times over that entire period. Sappington was ultimately deemed competent to stand trial in July 2004. He was tried and convicted later that month for the triple murders and other crimes committed in April 2001 (*Sappington*, 285 Kan. 158). He was tried in September 2004 for the crimes in the instant case committed in March 2001.

At trial, both Sappington and A.G. recanted their confessions. Sappington testified that he had nothing to do with the shooting,

that he was never at the shop and that he did not know A.G. or
Mashak. He claimed that he agreed to confess to the murder be-
cause Detective Greg Lawson, who took his confession, promised
that he would help Sappington avoid the death penalty in a differ-
ent homicide case if he confessed to shooting Mashak. Sappington
testified that he based his confession strictly upon information that
Lawson gave him.

Although A.G.'s preliminary hearing testimony was consistent
with his prior taped confession, when called by the State to testify
at trial he stated, "I can't do this. I can't lie like this, man. This
ain't right." He then testified that he did not know Sappington in
March 2001 and did not know who did the shooting. As a defense
witness, A.G. admitted that he had previously implicated Sapping-
ton as the shooter. However, he testified that he had gone to the
shop only to talk to Mashak about getting his car out of the tow
lot. While A.G. was talking to Mashak, a masked man entered the
body shop and just started shooting. A.G. testified that he then ran
out "scared for his life." After the shooting, his father picked him
up; A.G. testified that his father would testify that the father did
not pick up anyone other than A.G. at that time.

A.G. testified that he implicated Sappington only because De-
tective Lawson said that would mean that A.G. would remain in
juvenile court for his own charges. He further testified that when
Lawson walked him from the juvenile center to the police station,
Lawson told him details on what to confess.

The jury convicted Sappington of one count of first-degree fel-
ony murder and one count of attempted aggravated robbery. The
court sentenced him to life imprisonment without parole eligibility
for 20 years plus a consecutive term of 130 months' imprisonment,
with the sentences to run consecutive to the sentences imposed in
the triple murder case: consecutive sentences of three life terms
for the first-degree murders, 79 months for kidnapping, and 32
months for aggravated burglary.

More facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The prosecutor did not commit reversible misconduct dur-
ing closing argument.*

Sappington first contends that reversal and remand for new trial is required because the prosecutor improperly diluted the "beyond a reasonable doubt" burden of proof during closing argument. The State basically responds that no misconduct occurred.

Our standard of review was recently reiterated in *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007):

"Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.32 261 (2006) (citing cases)."

In the second step of the two-step analysis, the appellate court considers three factors to determine whether a new trial should be granted:

" '(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial], have been met.' " *State v. White*, 284 Kan. at 338.

Sappington specifically challenges the following comments made by the prosecutor during his rebuttal closing argument:

"You know, one of the things we talked about in voir dire, if you will remember, we talked about this beyond a reasonable doubt concept and there's not a single one of you here can say—can go into that jury room and say, I know beyond all doubt that Marc Sappington is the one who did this. There's not a single one of the 12 of you that can go back there and say, I know beyond any doubt that Marc Sappington is the one that did this. It's not what the law is asking you to do, though. Remember our test is beyond a reasonable doubt. *And is it reasonable*

*given that evidence that we have that Marc Sappington is the one that did this? And I suggest to you the answer is, yes, it is.*

"And, with that, I ask you to go back and consider all those things I asked you to do a little bit earlier and return those verdicts of guilty for both premeditated first degree murder and attempted aggravated robbery. Thank you." (Emphasis added.)

Sappington argues that the italicized statement suggested to the jury that it could convict him if they merely found it was "reasonable" to conclude he was the culprit, an incorrect statement of law that lessened the State's "reasonable doubt" burden of proof. As he correctly notes, a jury may convict a defendant only if it has "no reasonable doubt as to the truth of each of the claims required to be proved by the State." PIK Crim. 3d 52.02.

The parties have cited a number of cases for our guidance, several of which support both sides. In chronological sequence they are as follows:

In *State v. Banks*, 260 Kan. 918, 926, 927 P.2d 456 (1996), the defendant moved for a mistrial because the prosecutor argued in closing:

" 'My burden is the burden that you must consider this case beyond a reasonable doubt. It is not beyond any doubt, it is not beyond the shadow of a doubt, it is beyond a reasonable doubt.

" '*Reasonable doubt means if you are going to say these men are not guilty of something, you have to give a reason for it.*' " (Emphasis added.)

The court found the italicized language improper. However, it held that the trial court did not abuse its discretion in refusing to declare a mistrial due to this one statement. 260 Kan. at 926-28. The court concluded that when the prosecutor's argument was considered in its entirety, particularly the preceding nonitalicized language correctly stating the burden, the statements ultimately recognized that the burden of proof falls on and remains with the State. 260 Kan. at 927.

As an apparent factor in its calculus, the *Banks* court also observed that the district court had correctly instructed the jury: in effect, PIK Crim. 3d 52.02.

" 'The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.

" 'The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims made by the state, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant guilty.' " (Emphasis added.) 260 Kan. at 927.

In affirming the conviction despite the prosecutor's improper statement, this court emphasized the "other substantial and compelling evidence going directly to [defendant's] guilt." 260 Kan. at 928.

In *State v. Mitchell*, 269 Kan. 349, 7 P.3d 1135 (2000), the court held that the following remark during the prosecutor's closing argument was an erroneous and misleading statement of law: " 'the State's burden of proof in this type of criminal case and in any criminal case is a common sense burden.' " 269 Kan. at 360-61. It reasoned that the comment impermissibly suggested to the jury that it could convict the defendant "by using a burden of proof less than 'reasonable doubt.' " 269 Kan. at 361.

As in *Banks,* however, in *Mitchell* the court ultimately ruled that the improper remarks did not deny the defendant a fair trial essentially because of the weight of the evidence against him. Echoing part of the federal standard from *Chapman v. California,* this court held that the remarks had little, if any, likelihood of changing the result of the trial. 269 Kan. at 361.

The next year in *State v. Diggs,* 272 Kan. 349, 34 P.3d 63 (2001), the defendant likewise argued that the prosecutor misstated the State's burden of proof and erroneously shifted the burden to the defense. The opinion does not quote the prosecutor's closing argument, but states:

"Diggs contends that the prosecutor erred by equating the 'reasonable doubt' standard with 'common sense' or 'reasonable explanation.' She argues that the burden was shifted to Diggs when the prosecutor repeatedly asked the jury to consider whether Diggs' actions were 'reasonable.'

"Here, unlike *State v. Mitchell,* 269 Kan. 349, 357-61, 7 P.3d 1135 (2000), the prosecutor did not define reasonable doubt as 'common sense,' nor did he define it as a 'reasonable explanation.' He told the jurors that they could apply common sense to the facts in their deliberations, including the determination of whether rigor mortis had already started setting in when the EMT's arrived at the scene of the murder. It appears that the prosecutor questioned whether certain facts

were 'reasonable' in order to argue to the jury that the facts did not create a reasonable doubt." 272 Kan. at 363.

The *Diggs* court concluded that the prosecutor's comments were within the bounds afforded counsel for argument.

The next year in *State v. Finley*, 273 Kan. 237, 42 P.3d 723 (2002), the defendant argued that the prosecutor improperly defined the State's burden of proof with the following statement during closing argument:

" 'I would submit to you that a reasonable doubt is really nothing more than a fair doubt that's based on reason and common sense and arises from the status of the evidence. It's impossible for me to prove everything to you by an absolute certainty. At the same time, a defendant should not be convicted just on speculation and conjecture, but you have much more than that in this case. You don't just have speculation or conjecture that [defendant] is guilty.' " 273 Kan. at 248.

The *Finley* court noted the risk "that the definition gave the jury the impression that something slightly more than suspicion or conjecture is sufficient to reach reasonable doubt." 273 Kan. at 249. Nevertheless, it also noted that this conclusion would ignore the first part of the prosecutor's argument. Although seemingly deciding that the prosecutor's statement was error, and therefore qualifying as misconduct, the *Finley* court ultimately concluded that "[i]t cannot be said the prosecutor's argument regarding the burden of proof denied [defendant] a fair trial," because the court had earlier determined that the evidence of guilt was overwhelming. 273 Kan. at 249.

More recently, in *State v. Wilson*, 281 Kan. 277, 286, 130 P.3d 48 (2006), the court observed that the prosecutor's closing argument was far less egregious than the prosecutor's statement in *Finley:* " 'I want you to look at the evidence, remember all the testimony that you heard, and go back to that definition of reasonable doubt that, unfortunately, no one can say in precise words what it is. You just have to intuitively know when you see it.' " This court held that the prosecutor properly stated the law regarding reasonable doubt. 281 Kan. at 287.

In the instant case, the prosecutor did not expressly define the term "reasonable doubt" in improper language as did the *Banks* and *Mitchell* prosecutors. However, his inaccuracy is more serious

than the prosecutors' statements made in *Finley* and *Wilson*, and probably *Diggs,* on the issue of burden of proof. To convict a defendant of a crime, the jury must find that it has no reasonable doubt as to the truth of each claim the State must prove. PIK Crim. 3d 52.02. Yet, as Sappington argues, his prosecutor's statement suggests that a jury may convict if the jury believes that it is merely "reasonable" that he committed the crime. We conclude that this misstatement dilutes the State's burden because a jury could convict due to its reasonable belief that a defendant committed a crime while still having a reasonable doubt as to guilt. Accordingly, the comment is outside the wide latitude afforded a prosecutor.

The prosecutor's misstatement of the law, however, does not necessarily amount to reversible error. Reversal is not required unless the prosecutor's actions deprived Sappington of a fair trial. *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004). The first factor to consider in the harmlessness inquiry is whether the misconduct is gross and flagrant, *i.e.,* did it prejudice the jury against Sappington? See *State v. Elnicki*, 279 Kan. 47, 65, 105 P.3d 1222 (2005). We hold it did not.

As did the prosecutor in *Banks*, the prosecutor here did properly state the burden of proof in the sentence immediately preceding his misstatement, saying: "Remember, our test is beyond a reasonable doubt." Also, as in *Banks,* the overall closing argument made several clarifications on the burden of proof: that reasonable doubt is not "beyond all doubt" or "beyond any doubt." See also *Finley,* 273 Kan. 237 (court must read the prosecutor's erroneous statement together with his or her correct statements on the burden of proof).

Likewise, as in *Banks*, here the district court properly instructed the jury on the burden of proof, providing PIK Crim. 3d 52.02 on the burden of proof and reasonable doubt. Additionally, the court provided the jury with Instruction No. 8, which explained the alternate theories of murder in the first degree and reiterated that the burden of proof is beyond a reasonable doubt. A jury is presumed to have followed the instructions. *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004). In short, the prosecutor's conduct was not gross and flagrant.

Next, no real prosecutorial ill will has been shown. There is no indication that the prosecutor deliberately misstated the burden of proof with this isolated statement: "And is it reasonable given that evidence that we have that Marc Sappington is the one that did this? And I suggest to you the answer is yes, it is." Citing *Diggs*, the State argues that when placed in the context of his entire rebuttal argument, the statement was intended only to mean that it was reasonable, based upon the evidence presented at trial, to believe Sappington's confession instead of his trial testimony. In other words, the State claims that the prosecutor merely questioned whether certain facts were reasonable in order to argue that the facts did not create reasonable doubt.

The prosecutor's language is more direct and more troubling than that suggested in *Diggs*, making ill will a closer question. But the fact that it is merely close, and not clear, and when coupled with the language's one-time appearance during a lengthy closing argument, weighs against our finding ill will.

Lastly, the evidence against Sappington was of such a direct and overwhelming nature that the misstatement likely had little weight in the minds of the jurors. In response to Sappington's and A.G.'s trial recantation of their confessions, Detective Lawson testified that he did not tell them what to say prior to taking their statements. Although he had a good idea of the physical evidence prior to taking Sappington's confession, he did not know the "play by play" as detailed in their confessions. Moreover, he testified that he was very careful not to tell A.G. anything about Sappington's confession because he wanted to judge both suspects' credibility based upon how their statements coincided.

Lawson further denied ever promising Sappington that he would not receive a death sentence if he confessed to Mashak's killing. He also testified that after he walked A.G. the short distance from the detention center to his adjoining office building, A.G.'s attorney was present for a large portion of the interview that occurred prior to the taped confession.

Both Sappington's and A.G.'s taped confessions were played for the jury. A review of the tapes reveals that the two confessions closely paralleled each other in their detail and seem spontaneous

and unrehearsed. Both men were forthcoming with little need for exploratory questions by Lawson. During their taped confessions, both Sappington and A.G. stated that they were not coerced or promised anything in exchange for their statements. When questioned by Lawson at the end of his confession, Sappington specifically stated that the officers never told him what to say and that he volunteered all of the information.

Additionally, there was considerable circumstantial evidence supporting both confessions. Both Turner and Martin testified that after hearing shots at the body shop, they saw two men leaving together in a brown vehicle. Both Sappington and A.G. volunteered in their confessions that they fled in a brown vehicle. Eight assault rifle shell casings were found at the scene; shop occupant Sublett testified that the shooter not only fired an assault rifle but also wore a black mask. Sappington confessed to shooting an assault rifle and wearing a black scarf over his face.

Sublett testified that one man entered first, argued with Mashak, and as soon as he walked out an armed man entered and began shooting. He also testified that he could tell that the two men— A.G. and the shooter—were together and were executing a plan. Sappington confessed that they had a plan: A.G. was to enter the shop first, and he was to enter seconds later as the enforcer to hold a gun on the occupants. Additionally, an anonymous source called the police and identified Sappington as A.G.'s accomplice. Both Sappington and A.G. volunteered in their confessions that Sappington was the shooter.

Supportive of a plan, or at least of A.G.'s involvement, was an officer's testimony that the pager found at the scene contained messages from A.G.'s family on the day of the shooting, stating, "don't ruin your future," "please turn around before it's too late," "don't choose lockup over Grandma, Marie, yourself, your future," and "go to [church] before it's too late." Similarly, A.G. was identified by the victim's wife as the man with whom her husband had had recent difficulty about a blue car and identified by shop occupant Sublett as the man who had entered to angrily argue about the car shortly before the shooting.

Furthermore, A.G.'s father directly contradicted A.G.'s trial testimony that his father only picked up A.G. after the incident. In the process the father corroborated many of the details of the recanted confessions—which Sappington and A.G. claimed were based upon information fed to him by Detective Lawson.

The father testified that on March 16, 2001, A.G. called him sometime in the afternoon to come pick him up at an apartment building. The father further testified that he picked up both A.G. and A.G.'s friend, whom he did not know. When he got to the building, he opened his trunk from the inside of his car, and A.G. and the friend put their shoes in the trunk. The friend then sat in the back seat and A.G. sat in the front. The father dropped the friend off somewhere on a side street "off of 7th Street." He and A.G. then picked up A.G.'s mother from work, ran some errands, and took A.G. to the bus station for a planned trip to visit his sister in Texas.

Similarly, in their recanted confessions, both Sappington and A.G. independently stated that following the shooting they disposed of their vehicle and then went to an acquaintance's apartment where A.G.'s father picked them up. According to both these confessions, A.G.'s father popped the car's trunk from inside the vehicle, and then they put their shoes and the firearm in the trunk. A.G. confessed that Sappington sat in the back. According to both their confessions, A.G.'s father dropped Sappington off at 8th and Parallel streets. In A.G.'s confession, he stated that after dropping Sappington off, A.G. and his dad picked his mom up from work, went to Walmart, and then to the bus station where he left to visit his sister in Texas.

Given the jury's conviction, it obviously rejected the recantations. A.G.'s and Sappington's taped confessions were well corroborated by other testimony and evidence, and the confessions were made more telling by Sappington's and A.G.'s unusual trial stories.

In conclusion, although prosecutorial misstatement occurred in this case, reversal is not required because the prosecutor did not prejudice the jury against Sappington and deny him a fair trial. We hold that the harmlessness standards are satisfied from both K.S.A.

60-261 (not inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclude beyond a reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial).

*Issue 2: The district court did not err in denying Sappington's motion for change of judge.*

Sappington next contends the trial judge erred by refusing to recuse himself from the instant case after making biased remarks at the sentencing hearing for the triple murder case. The State responds that the remarks were nothing more than fair characterizations of the facts of a grisly case.

Our standard of review is well known:

" 'When a district court refuses to recuse itself from a trial upon the defendant's request, this court has promulgated a two-part test to determine whether the defendant received a fair trial or whether the defendant's due process rights were violated: (1) Did the trial judge have a duty to recuse himself or herself from this case because the judge was biased, prejudicial, or partial? (2) If the judge did have a duty to recuse and failed to do so, is there a showing of actual bias or prejudice to warrant setting aside the judgment of the trial court?' " *State v. Walker*, 283 Kan. 587, 605, 153 P.3d 1257 (2007) (quoting *State v. Alderson*, 260 Kan. 445, Syl. ¶ 2, 922 P.2d 435 [1996]).

K.S.A. 2006 Supp. 20-311d provides the procedure for a party's request for a change of judge. First, the party must file a motion for change of judge without stating in the motion the grounds for belief that the judge cannot afford the party a fair trial. The assigned judge shall then hold an informal hearing on the motion. Next, if the judge refuses to recuse, the party seeking a change of judge may then file an affidavit alleging the grounds for change of judge. K.S.A. 2006 Supp. 20-311d(a). If an affidavit is filed, the chief judge of the district shall at once determine the legal sufficiency of the affidavit. If the affidavit is found to be legally sufficient, the case shall be assigned to another judge. K.S.A. 2006 Supp. 20-311d(b).

K.S.A. 2006 Supp. 20-311d(c)(5) articulates the affidavit grounds upon which Sappington relies: "that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a

fair and impartial trial or fair and impartial enforcement of post-judgment remedies."

On the first day of the jury trial, Sappington fax filed a motion asking Judge Burdette to recuse himself. Judge Burdette had also presided over the July 2004 triple murder trial and subsequent sentencing. Although neither the faxed motion or the sentencing transcript is contained in the record on appeal, Sappington appears to argue in the Mashak trial transcript that the judge had described Sappington as a "homicidal time bomb" when imposing the sentences approximately 3 weeks earlier on September 2. According to defense counsel's statement in the Mashak trial transcript, at sentencing Judge Burdette had also stated that "if [Sappington] was going to ever get out again, I had no doubt he would do this again." Due to these statements, Sappington's motion alleged that the judge was prejudiced against Sappington and that this prejudice would "contaminate the jury."

Judge Burdette held an informal hearing on the matter outside the presence of the jury and denied Sappington's motion. The judge stated that his statements solely addressed the sentencing of Sappington in the prior case and had "absolutely nothing to do with his guilt or innocence in this case." He further stated that he had no trouble being fair and impartial in this case. He also noted that pursuant to statute, the defense could file a more detailed motion with the chief judge of the district court if it chose to further pursue the matter.

Sappington did not file a motion with the chief judge, and did not reestablish his request for a change of judge until his motion for new trial. In denying Sappington's motion on that ground, Judge Burdette stated that Sappington failed to raise any issues necessitating the court's recusal of itself and noted that he failed to take further proceedings beyond the informal hearing.

Sappington argues to this court that the judge's reference to Sappington as a "homicidal time bomb"—or as stated in his brief as a "ticking time bomb"—evidenced the judge's hostile feeling against him and suggested that the judge "had already reached an unalterable conclusion about Mr. Sappington's character." He ar-

gues that based upon these statements, a reasonable person would have doubt about Judge Burdette's impartiality toward Sappington.

The State counters that Judge Burdette's statement in the triple murder case was made concerning the facts of that case and was given as a reason for the court's imposition of maximum, consecutive sentences. It characterizes the comment as "nothing more than a fair characterization of the facts of a grisly triple murder case where one person was dismembered, another left dead in a car in a public parking lot and the third left dead with a broken knife blade embedded in his back." Consequently, the State argues that the comment does not establish that the court was biased, prejudicial, or partial.

The first step in our analysis is to determine whether the judge had a duty to recuse from this single murder case based on his statement made during sentencing in the triple murder case. We initially observe that Sappington has failed to sufficiently designate a record to support his claim, *e.g.*, a copy of his fax-filed motion to recuse, much less the sentencing hearing transcript. We have only the transcript of the limited discussion regarding the motion on the first day of trial. As such, this court is prevented from considering the context in which the judge made the challenged statement. A defendant possesses the burden to designate a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the trial court was proper. *State v. Holmes*, 278 Kan. 603, 612, 102 P.3d 406 (2004).

Moreover, Judge Burdette did not have a duty to recuse himself from this case based on his characterization of Sappington in the prior case. We acknowledge that a judge should disqualify himself or herself if the circumstances of the case "create reasonable doubt concerning the judge's impartiality, *not* in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *State v. Logan*, 236 Kan. 79, 86, 689 P.2d 778 (1984). We further acknowledge that the Kansas Code of Judicial Conduct states that a judge has a duty to recuse himself or herself from a case when "the judge's impartiality might reasonably be questioned." This includes instances where "the

judge has a personal bias or prejudice concerning a party." Rule 601A, Canon 3E(1)(a) (2006 Kan. Ct. R. Annot. 576-77).

Given that this isolated statement occurred in a completely separate case and that this court is prevented from placing it in the context in which it was made, we cannot say that a reasonable person would have reasonable doubt regarding Judge Burdette's impartiality. The statement is analogous to the judge's reference to the defendant as a "mean mother" in *State v. Griffen*, 241 Kan. 68, 71, 734 P.2d 1089 (1987). That particular reference was made prior to sentencing during the judge's attempt to summarize the findings of the presentence investigation report to substitute defense counsel. 241 Kan. at 71. This court concluded that the judge's remarks, while "ill-advised," did not demonstrate partiality, prejudice, or bias on his part. 241 Kan. at 71-73. Similarly, Judge Burdette's reference to Sappington as a "homicidal time bomb" in the triple murder case does not demonstrate that he was biased or prejudiced against Sappington in the instant case.

Second, even if we were to assume that Judge Burdette had a duty to recuse himself from this case, Sappington still needs to demonstrate actual bias or prejudice by the judge. This court has often rejected claims of error in denials of motions for change of judge due to a lack of demonstrated prejudice. See, *e.g.*, *Walker*, 283 Kan. at 609; *State v. Reed*, 282 Kan. 272, 279, 144 P.3d 677 (2006); *Griffen*, 241 Kan. at 73. Sappington has not pointed to anything in the record, nor can we find anything there, showing that Judge Burdette exhibited bias or prejudice at trial or sentencing in the instant case. Therefore, the court did not err in denying Sappington's motion for change of judge.

Issue 3: *The district court did not err in admitting certain autopsy photographs into evidence.*

Sappington next contends the district court erred in admitting certain autopsy photographs into evidence because they were "overly repetitious, gruesome and only went to inflame the jury." At trial, he objected to only four of these photographs: Exhibits # 21, # 24, # 26, and # 27. The State counters that the photographs

were not cumulative or overly gruesome and were used by Dr. Pojman to illustrate his testimony regarding the manner of death.

The standard of review for the admission of these photographs requires us to first determine whether they are relevant, *i.e.*, probative. *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). See *State v. Kirby*, 272 Kan. 1170, 1186-88, 39 P.3d 1 (2002); *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842 (1987) (Photographs and videotape of homicide victims "had a reasonable tendency to prove or disprove a material fact in issue, or shed light upon a material fact.").

State's Exhibit # 21 is a "body shot" of the victim at the time of autopsy. Exhibit # 24 shows two lesions located on the top of the victim's left shoulder. Exhibit # 26 shows two large wounds on the left side of the torso and a large sutured incision made by medical personnel at the hospital. Exhibit # 27 is a closer view of the two injuries depicted in Exhibit # 26. In overruling Sappington's objections, the district court held that the State was allowed to show that the victim died and that Dr. Pojman, who performed the autopsy, could use these photographs to aid the jury's understanding of how Mashak died.

Dr. Pojman testified that the photographs would be useful in his testimony to help him explain to the jury the nature and location of the injuries. After describing the injuries depicted in each photograph, Dr. Pojman referred to them to explain how the injuries caused Mashak's death. Specifically, he used the photographs to explain the gunshot wounds and why he surmised that the shots went from back to front. He also used them to explain that the wounds were irregular, particularly using the photograph of the closer view of the chest wounds to better explain their irregularity to the jury. He concluded that Mashak died of multiple gunshot wounds depicted in the photographs, most important a wound to the chest, which resulted in a loss of blood.

Clearly the photographs were used to prove the manner of death and to explain medical testimony. They are relevant and admissible. See *State v. Bell*, 273 Kan. 49, 52-53, 41 P.3d 783 (2002) (Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible.); *State v. Deal*, 271 Kan.

483, 493, 23 P.3d 840 (2001) (Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible, including photographs which aid a pathologist in explaining the cause of death.). Even though at trial Sappington did not challenge Mashak's cause of death, we have held that the prosecutor has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. See *State v. Gholston*, 272 Kan. 601, 613, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002).

Sappington argues that the photographs are overly repetitious, gruesome, and introduced only to inflame the jury, *i.e.*, prejudicial. Our standard of review of these claims is abuse of discretion. *State v. Parker*, 277 Kan. 838, 847, 89 P.3d 622 (2004) (An abuse of discretion has occurred when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice.). The facts that two of the photographs, Exhibits # 26 and # 27, depict the same injuries does not render such photographs unduly repetitive when, as here, they depict different aspects of those injuries. *State v. Hernandez*, 284 Kan. 74, 101, 159 P.3d at 950 (2007) (citing *State v. Bradford*, 272 Kan. 523, 534-35, 34 P.3d 434 [2001]). We observe that the admission of photographs in a murder case has rarely been held to be an abuse of discretion. *State v. Torres*, 280 Kan. 309, 327, 121 P.3d 429 (2005) (citing *State v. Deal*, 271 Kan. at 493).

We have reviewed the four photographs and find no abuse of discretion in their admission into evidence.

As to the other photograph about which Sappington complains, Exhibit # 22, no objection was made at trial to its admission. As such, the issue of its admission was not preserved on appeal. K.S.A. 60-404; *State v. Torres*, 280 Kan. at 328.

Issue 4: *The district court did not err in refusing to grant Sappington's request for new counsel.*

Finally, Sappington contends the court erred in denying his multiple requests for new counsel which deprived him of the opportunity to participate in his own defense. The State basically re-

sponds that his counsel did a commendable job under difficult circumstances, *i.e.*, those created by Sappington's repeated mental problems. We independently observe that over a 3-year span, from his April 2001 arrest through his September 2004 trial, Sappington was found mentally competent, then incompetent, then competent, then incompetent, and then competent. Each of Sappington's motions to change counsel was filed during periods of competency, with the trial for Mashak's murder being conducted 2 months after his latest competency determination and trial for triple murder.

A district court's refusal to appoint new counsel is reviewed under an abuse of discretion standard, which asks whether any reasonable person would take the view adopted by the district court. *State v. McGee*, 280 Kan. 890, 894, 126 P.3d 1110 (2006). The burden is on the party alleging the abuse. *State v. White*, 284 Kan. 333, Syl. ¶ 3, 161 P.3d 208 (2007).

Furthermore, to warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. *McGee*, 280 Kan. at 894. But ultimately, " '[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel. [Citation omitted.]' " *State v. Ferguson*, 254 Kan. 62, 70, 864 P.2d 693 (1993) (quoting *State v. Banks*, 216 Kan. 390, 394, 532 P.2d 1058 [1975]).

The facts concerning Sappington's motions for change of counsel in the instant case are identical to many of those in the triple murder because certain proceedings were consolidated until shortly before the triple murder trial began in late July 2004.

After being found competent to stand trial in December 2001, Sappington filed his first pro se "Motion for Relief of Court Appointed Counsel" on March 25, 2002. He alleged that irreconcilable conflicts of interest existed, specifically that he lacked confidence in attorney Patricia Kalb's representation and that she was not providing "faithful representation." Sappington later withdrew

the motion with the hope that he and Kalb "could work through the problems."

In January 2003 Sappington was found incompetent to stand trial because, among other things, his attorney stated that voices were telling him not to talk to her, and Dr. Logan determined that he was unable to "consult with his attorney in preparing his defense." The January trial was postponed. In April 2003, he was again found competent, and trial was rescheduled for the following August.

On June 17 Sappington stopped taking his medications and his counsel filed for a trial continuance. On July 9 he filed another motion for relief of counsel. It was nearly identical in content to the March motion except that it also alleged a "complete breakdown in communication with his counsel."

On July 28, 2003, the court held a hearing on Sappington's July 9 motion. There, Sappington told the court that Kalb failed to comply with his "reasonable requests" or failed to do so in a timely manner. Sappington provided the court with his letters to Kalb requesting copies of statements of witnesses and the preliminary hearing transcript. He also stated that Kalb failed to speak with him enough regarding possible plea agreements and different aspects of his case.

Kalb testified that she had met with Sappington the previous day to discuss their problems. She did not feel that their problems were "that serious." Kalb stated that Sappington's mental health problems had been the cause of many of the delays in this matter. She admitted that it had taken some time to get the witness statements from the State and that it had taken a while to get the transcript, but that the "more important" issue was that she and Sappington were having a "hard time" communicating regarding his theory of defense. Kalb seemed to imply that this difficulty was largely due to Sappington's mental status and stated that she had tried to convey to him her thoughts on a defense.

The court denied Sappington's motion. It informed him that the defendant always has the final say in his defense, that his had been one of the more serious and complex cases in the county's recent history, and that his mental status had caused some delay. It found

no legal sufficiency in Sappington's argument and stated that it would not change counsel with a trial date set for 1 week from the day of the hearing. The court concluded that Kalb had zealously guarded Sappington's constitutional rights and that it could find no fault in her representation.

Within the week, the August 2003 trial was postponed because Sappington again stopped taking his medication, and he was again found incompetent. Trial was eventually rescheduled. That trial was later postponed because of Sappington's continued incompetence and Dr. Logan's characterization of his "partial malingering."

In July 2004 Sappington was once again found competent, and his trial for the triple murder began on the 19th of that month. The morning of trial, he made an oral motion to dismiss counsel, claiming that she lied when she said she would come see him and again claiming that she did not bring him documents. After counsel denied the allegations, the court denied the motion, finding counsel's representation "first rate" and adding that it felt no stone had been left unturned in his defense. Sappington renewed his motion at the close of evidence, requesting a mistrial because Kalb did not ask all of the questions that he requested. After counsel responded, the court denied the motion, and he was convicted of all charges. He renewed his position in his motion for new trial, which the court denied, stating that no one could say that counsel had not performed competently.

Sappington's trial for the Mashak charges began on September 27, 2004. As he had done the first day of trial in the triple murder case, that morning Sappington made an oral motion to dismiss counsel. He again did not believe Kalb had been adequate in her preparation, particularly in corresponding and otherwise dealing with him to build his case or decide on a defense. For other reasons, he referred to "the last motion to relieve counsel."

In response to the court's inquiry, Kalb stated that she was prepared to proceed to trial in this case. The court denied Sappington's motion, stating that Sappington's general statements did not rise to the legal threshold for the court to consider removal of counsel, especially in light of the timing of the motion. The court further stated that Sappington had failed to present arguments different

from those raised in the triple murder case and in his previous motions. The court found that based upon all of its observations, Sappington was receiving the benefit of an experienced criminal defense attorney, and that it could "see nothing whatsoever that would support his contention that counsel should be removed."

When Kalb argued Sappington's motion for new trial on December 10, 2004, she asserted that he was unable to meaningfully communicate with counsel, reminding the court that he had requested new counsel before the trial in the instant case as well as in the triple murder case. The court denied Sappington's motion, observing that "we've had this issue several times" and "have discussed it at length." It held that there was "no evidence whatsoever" that Sappington was unable to communicate with his attorney at trial.

To begin our analysis, we note that in order to determine whether to appoint new counsel, the district court must conduct some sort of investigation. Here, the court satisfied this requirement by fully hearing Sappington's complaints and fully hearing his counsel's responses, both at the July 2003 motion hearing and the September 2004 trial. The court further satisfied this requirement by its own observations of counsel's performance over the course of 3 years. See *State v. Collier*, 259 Kan. 346, 359, 913 P.2d 597 (1996). Sappington had the same attorney, Kalb, throughout both cases. According to the record on appeal, her performance observed by the court included multiple actions to protect Sappington's rights regarding his competency to stand trial and other pretrial matters. She was especially diligent in monitoring Sappington's mental health, frequently requesting a continuance or a finding that Sappington was incompetent to stand trial at that time. Overall, the court concluded that Kalb had performed at a high level of advocacy on Sappington's behalf.

The district court was well aware of the unique circumstances of this case. Throughout this lengthy process, an overarching consideration was seeing if Sappington was capable of being found competent to stand trial. As a result, the court was quite cognizant of the substantial challenges any counsel would have faced representing Sappington. In an analogous context, the court in *State v.*

*Ferguson* observed that a lack of communication between a defendant and counsel does not automatically constitute a violation of the Sixth Amendment right to counsel. 254 Kan. at 71. There, the court agreed with the State that " 'lack of communication between a defendant and defense counsel *due to a defendant's refusal to cooperate* is not of itself basis for reversal on grounds of ineffective assistance of counsel.' " (Emphasis added.) 254 Kan. at 73-74. The *Ferguson* court held that under the circumstances of that case, substitution of counsel would have been futile.

The instant case admittedly is distinguishable from *Ferguson* because there is no evidence that any communication problems between Sappington and Kalb were deliberate on his part. In Sappington's case, however, there were multiple competency and incompetency determinations, and the district court was forced to continue trial several times after finding that Sappington was not competent to stand trial or able to assist in his own defense. Based upon these determinations and Kalb's statements at the July 2003 hearing on Sappington's motion, it is doubtful the appointment of substitute counsel would have solved the communication problems.

Another consideration is the timeliness of Sappington's motion. This court has held that a request for substitute counsel made on the first day of trial is not timely. *State v. Collier*, 259 Kan. at 358-59. Although, as Sappington points out, his oral trial motion was not his first request for new counsel, he has provided no explanation for his delay in making an additional request. Furthermore, Kalb's July 2003 statements, which Sappington primarily relies as evidence of a communication problem, were made over a year before his trial in this case.

Finally, Sappington has failed to point to any facts that demonstrate a "complete breakdown of communication" between him and counsel at trial. Despite his assertion to the contrary, Sappington actively participated in his defense. Unlike at the triple murder trial, he testified and, through counsel's direct examination, completely presented his theory of defense: he had absolutely no involvement in the crime. Accordingly, he recanted his confession on the stand. Moreover, counsel Kalb called A.G. to testify and

elicited his testimony where he not only recanted his confession implicating Sappington but also corroborated Sappington's defense theory. Sappington does not allege that he disagreed with Kalb's trial strategy.

In light of the foregoing, the court had a reasonable basis for believing that the attorney-client relationship had not deteriorated to a point where Kalb could no longer effectively aid Sappington in the fair presentation of his defense. Sappington failed to show "justifiable dissatisfaction" with his counsel, e.g., a complete break-down in communications. Accordingly, the district court did not abuse its discretion in denying Sappington's motions.

Affirmed.

DAVIS, J., not participating.

GREENE, J., assigned▪