Filed 2/29/16  P. v. Anderson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES THOMAS ANDERSON,<br><br>Defendant and Appellant. | F068293<br><br>(Super. Ct. No. CRF40672)<br><br>**OPINION** |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Donn Ginoza, under appointment by the Court of Appeal; Robert J. Beles and Manisha Daryani for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Before Levy, Acting P.J., Kane, J., and Smith, J.

Charles Thomas Anderson was convicted of manufacturing methamphetamine (Health & Saf. Code,[1] § 11379.6, subd. (a)) and possession of methamphetamine for sale (*id.*, § 11378), and he admitted numerous prior-conviction enhancements. He was sentenced to a total term of 23 years in prison.

Appointed counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436. After a review of the record, we noted the trial court had failed to award Anderson custody credits for the time spent in custody before he was sentenced. We did not identify any other arguable issues in the case. We advised counsel of our proposed disposition of remanding the matter to permit the trial court to address the issue of custody credits.

In the interim, Anderson retained counsel, who filed a supplemental brief raising two issues not originally briefed, to which the Attorney General filed a reply. We conclude the two issues identified by appellate counsel—whether the prosecutor erred in closing argument by (1) improperly lessening its burden of proof and (2) improperly commenting on Anderson's choice not to testify—do not have any merit. Both parties agree we should remand the matter to allow the trial court to address the issue of custody credits. Accordingly, we will affirm the judgment and remand as stated in our proposed disposition.

### *FACTS AND PROCEDURAL HISTORY*

The first-amended information charged Anderson with manufacturing methamphetamine (§ 11379.6, subd. (a)), possession of methamphetamine for sale (§ 11378), and making criminal threats (Pen. Code, § 422). In addition, the information alleged Anderson (1) had suffered a prior conviction that constituted a strike within the meaning of Penal Code section 667, subdivisions (b) through (i); (2) had suffered three

---

[1]All further statutory references are to the Health and Safety Code unless otherwise stated.

prior convictions that resulted in him spending time in prison (Pen. Code, § 667.5, subd. (b)); and (3) had committed these offenses while on bail or released on his own recognizance in three other cases within the meaning of Penal Code section 12022.1. As to the criminal-threats count, the information alleged Anderson had suffered a prior serious felony conviction within the meaning of Penal Code section 667, subdivision (a)(1). As to the manufacturing count, the information alleged Anderson had suffered a prior conviction for manufacturing methamphetamine within the meaning of section 11370.2, subdivision (b). As to the sale count, the information alleged Anderson had suffered a prior conviction for possession of methamphetamine for sale within the meaning of section 11370.2, subdivision (c).

Prior to submission of the matter to the jury, the prosecutor dismissed the criminal-threat count, and Anderson admitted each of the prior-conviction allegations.

Tuolumne County Sheriff's Detective Victor Serrano, Jr., testified that, during a search of a house owned by Anderson, he found 97 grams of methamphetamine, a digital scale, $60 in $1 bills, and two $20 bills, all of which he found indicative of sale of methamphetamine. Although Anderson was not home at the time of the search, the items were found in a bedroom apparently occupied by Anderson. Anderson's wallet containing his driver's license was found in the bedroom. It appeared someone had slept in the bed. In the kitchen of the residence Serrano found a glass jar with methamphetamine residue in it, as well as a can of denatured alcohol. These items were indicative of a chemical process used to either clean "dirty" methamphetamine or to recrystalize diluted or "cut" methamphetamine. In both situations, the process was used to increase the value of the methamphetamine.

Five individuals were inside the house when entry was made by police officers, although Anderson was not present. Serrano recognized three of the five individuals— Sarah Geisdorff, Eric Bailey, and Richard Garris. The record established that Glenna

Hunter also was at the residence. At least three of the individuals had a significant drug history.

Serrano also noticed there were two video surveillance cameras on the property, both pointing toward the driveway and down to the road. A television monitor for the cameras was found inside the bedroom apparently occupied by Anderson. If someone had been in the bedroom, he or she would have seen the officers approach the house on the monitor.

Small bags of methamphetamine were found in a second bedroom that was occupied by Lotty Bailey.

Criminalist Berkley Akutagawa confirmed the weight of the substance found in Anderson's bedroom and that the substance confiscated contained methamphetamine. She also confirmed the jar contained 3.24 grams of methamphetamine.

Hunter testified she was at the house with her stepdaughter, Geisdorff (also referred to as Sarah Jo Foster), to do laundry. They had been there only a few minutes before the police arrived. No one was home when Hunter and Geisdorff arrived at the house. Hunter did not enter Anderson's bedroom. Another man arrived at the house before the police arrived.

Garris confirmed he arrived at the house with an individual identified only as "Matt," shortly before the police arrived. Garris also admitted he used to be a heroin addict.

Defense counsel called Amber Turner who testified Anderson had been staying with her at her home for a few days before and after the police searched his home. Anderson was with Turner when he received a phone call informing him the police were searching his house.

The prosecutor argued that the only reasonable inference from the undisputed facts was that Anderson possessed the methamphetamine for sale, and he was manufacturing methamphetamine within the meaning of the statute. Defense counsel admitted the house

4.

belonged to Anderson and the methamphetamine was found in his bedroom. Defense counsel argued, however, that Anderson was not in possession of the methamphetamine, pointing out Anderson was not present at the house for several days, and five individuals, all known to be drug users, were present when the police arrived. The only reasonable inference from these facts, according to defense counsel, was that one of those individuals brought the methamphetamine to the house to sell to the other individuals, and when the police arrived they hid the methamphetamine in Anderson's bedroom.

The jury found Anderson guilty of both remaining counts. The trial court sentenced Anderson to an aggravated term of seven years on the manufacturing count, doubled that term to 14 years because of the strike prior, added three years for the three Penal Code section 667.5, subdivision (b) enhancements, added three years for the section 11370.2, subdivision (b) enhancement, and added three years for the section 11370.2, subdivision (c) enhancement, for a total term of 23 years in prison. The six-year prison term on the possession-for-sale count was imposed concurrently to the manufacturing count.

## *DISCUSSION*

We have reviewed the entire record, including the two motions made by Anderson pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. The only issue we have identified is the failure of the trial court to award Anderson any custody credits. When we advised counsel for the parties that we intended to remand the matter to the trial court to address the custody-credit issue, Anderson took the opportunity to retain new counsel who then filed a supplemental brief raising two issues. The Attorney General filed a response brief, and appellate counsel filed a reply brief. We now turn to the issues identified by Anderson.

### *Lessening the burden of proof*

Anderson asserts the prosecutor argued to the jury that if his theory was reasonable, he had met his burden of proving Anderson guilty beyond a reasonable doubt.

5.

Anderson cites *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*) to support his argument.

The first issue in *Centeno* was the prosecutor's use of a visual aid unrelated to the facts of the case in an attempt to explain the concept of *beyond a reasonable doubt*. The visual aid was a recognizable diagram of the State of California with errors in the location and names of some cities. The prosecutor argued the diagram pictured the state of California, despite the errors, suggesting, in essence, that proof beyond a reasonable doubt could be established even if there were errors or inconsistences in the evidence. The Supreme Court first noted it had repeatedly discouraged the use of such aids by prosecutors and courts (*Centeno, supra,* 60 Cal.4th at p. 667) and then concluded, "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately recognizable and irrefutable. Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Id*. at p. 669.)

Anderson's argument in this case, however, is based on the second error in the prosecutor's argument identified by the Supreme Court, which risked misleading the jury about the applicable standard of proof. In order to understand this issue fully, we will quote at length the Supreme Court's decision.

> "The prosecutor told the jury that in reaching its decision it must reject impossible and unreasonable inferences, and only consider reasonable possibilities. She stated that 'your decision has to be in the middle. It has to be based on reason. It has to be a reasonable account.… [Y]ou need to look at the entire picture, not one piece of evidence, not one witness … to determine if the case has been proven beyond a reasonable doubt.'

"She then asked the jury to consider the following: 'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.* [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?' (Italics added.) She continued: 'Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he*['*s*] *good for it? That is what is reasonable. He's good for it.*' (Italics added.)

"We observe at the outset that many parts of the prosecutor's argument were unobjectionable. It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory. [Citation.] It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts. [Citation.] It is certainly proper to urge that the jury consider all the evidence before it. [Citations.]

"Here, the prosecutor's argument began with what the jury could consider: reasonably possible interpretations to be drawn from the evidence. While this is an acceptable explanation of the jury's starting point, it is only the beginning. Setting aside the incredible and unreasonable, the jury evaluates the evidence it deems worthy of consideration. It determines just what that evidence establishes and how much confidence it has in that determination. The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt. [Citation.] The prosecutor, however, left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden. The failure of the prosecutor's reasoning is manifest.

"Section 1096, codifying the standard of proof, expressly provides that a 'reasonable' doubt is not a mere '"possible"' or '"imaginary"' doubt. In *People v. Romero* (2008) 44 Cal.4th 386 (*Romero*), we approved the prosecutor's argument that the jury must '"decide what is reasonable to

believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable.'" [Citation.] We concluded that '[n]othing in [that] explanation lessened the prosecution's burden of proof. The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt.' [Citation.]

"Conversely, it is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof.* In *State v. Sappington* (2007) 285 Kan. 176, the prosecutor told the jurors that they were not required to '"know beyond any doubt"' that the defendant was guilty and explained: '"Remember our test is beyond a reasonable doubt. *And is it reasonable given that evidence that we have that* [*the defendant*] *is the one that did this? And I suggest to you the answer is, yes, it is.*"' [Citation.] The Kansas Supreme Court concluded that the prosecutor misstated the burden of proof: 'To convict a defendant of a crime, the jury must find that it has no reasonable doubt as to the truth of each claim the State must prove. [Citation.] Yet, as [defendant] argues, his prosecutor's statement suggests that a jury may convict if the jury believes that it is merely "reasonable" that he committed the crime. We conclude that this misstatement dilutes the State's burden because a jury could convict due to its reasonable belief that a defendant committed a crime while still having a reasonable doubt as to guilt.' [Citation.]

"It is likewise error to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.] It is, and remains, the prosecutor's burden to prove the case. If the defense chooses to produce evidence, the jury must, of course, consider it as part of the complete record before it. To that end, the prosecution can surely point out that interpretations proffered by the defense are neither reasonable nor credible. Nevertheless, even if the jury rejects the defense evidence as unreasonable or unbelievable, that conclusion does not relieve or mitigate the prosecutorial burden. The prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own. In [*People v.*] *Ellison* [(2011) 196 Cal.App.4th 1342]*,* for example, the prosecutor made several arguments to the effect that '"you have to look at whether or not it's reasonable or unreasonable for the defendant to be innocent,"' and to vote not guilty if '"it's reasonable that the defendant is innocent ...."' [Citation.] The appellate court concluded that 'the prosecutor improperly attempted to lessen the People's burden of proof by arguing to the jury that the beyond-a-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable.' [Citation.]

"Here, the prosecutor did not simply urge the jury to '"accept the reasonable and reject the unreasonable"' in evaluating the evidence before it. [Citation.] Rather, she confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden.

"It is reasonably likely that the prosecutor's hypothetical and accompanying argument misled the jury about the applicable standard of proof and how the jury should approach its task." (*Centeno, supra,* 60 Cal.4th at pp. 671-674.)

When the entirety of the Supreme Court's discussion is considered, it is apparent that *Centeno* condemns the argument by the prosecution, which, either intentionally or unintentionally, attempts to lighten the prosecutor's burden of proof to something less than beyond a reasonable doubt by suggesting the jury need only conclude that a reasonable interpretation of the evidence is sufficient to find a defendant guilty. As we shall explain, the prosecutor in this case did not argue that the burden of proof should be any standard other than beyond a reasonable doubt.

As stated above, defense counsel admitted the house belonged to Anderson and the bedroom in which the drugs were found was Anderson's room. The prosecutor began his rebuttal argument by noting the defense rested almost entirely on the assertion that Anderson was not at home when the police searched his house. He then noted that Anderson's witness to his fact, Turner, was not believable. The prosecutor continued:

"And then what do you have left? Well, you have that circumstantial evidence that is from—is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question.

"Now, *here is a much more reasonable scenario*. I remember, years and years ago, when I was a little kid, I was really into ships. And I remember reading about stories about weird ship things. And there was one—this one ship, called it the Marie Celeste. They found it floating in the middle of the ocean, and the plates were still on the table. Literally, not

9.

a person on the boat.  These people just—had just vanished off that boat, and the plates were still on the table.

       "Look at this house.  Kind of reminds me of that story, because when the police get there, the T.V.  is on, and that T.V. would tell anybody sitting in that room who is coming up the drive.  His wallet—his wallet with his only I.D. is sitting right there.  [Defense counsel] has, over and over again—'Why would they—people be there?  Why would a guy who has a drug history show up with 30 bucks [in his pocket]?'  I wonder why.

       "Well, a very logical inference from that set of facts is, that he's there, he's got the T.V. on, place is open for business.  *That is every bit as reasonable of an interpretation.*

       "If you look at this land, if he's the one that knows, because these other people are just sitting in the living room—I don't know what they're doing.  And I would submit to you, I had to bring in Miss Hunter and this other guy because you'd be asking, 'What about these people?'  So you get who you can and you bring them in.  She can't even get her story straight.  There is only three people?  One person says there is five people.  Who knows?  Who knows if they're all there to buy drugs?

       "But that back door, just like the detective said, that back door goes into the woods.  So how long would it take him, in his bedroom with the video on, his room, mind you, with the video on, to go out that door and be gone, gone, gone?  Not very long."  (Italics added.)

The two italicized portions of the above quote are the sections of the closing argument to which Anderson refers.  We have quoted the entire portion of this argument to establish that Anderson's argument relies on taking the prosecutor's statements out of context.  It is readily apparent the prosecutor was arguing that a *reasonable interpretation of the circumstantial evidence* was that Anderson was home when the police arrived, but escaped into the woods when he saw the police on the monitor.  Indeed, the jury had been instructed that, "when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."  (CALCRIM No. 224.)  It also is readily apparent the prosecutor was not arguing that Anderson should be found guilty simply because the prosecutor's interpretation of the evidence was reasonable.  The prosecutor did not err in making this argument to the jury.

*Griffin[2] error*

Second, Anderson asserts the prosecutor committed *Griffin* error during closing argument. "In *Griffin v. California* (1965) 380 U.S. 609, the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. [Citations.] Nonetheless, as defendant observes, we have held that a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.)

Defense counsel asserted in closing argument that Anderson was not at the house when the police arrived. He also asserted that perhaps the surveillance system set up by Anderson would have helped determine who was at the house and when they arrived. "Nobody bothered, apparently, to look at this T.V. I don't know if maybe that T.V. would have shown. It shows people coming and going, as well as police or sheriff's deputies. It would also show, apparently, these people when they arrived, and that would have been a very interesting thing to look at, you know, if they had the evidence."

The prosecutor responded to this argument in his rebuttal argument. "Now, another problem for [defense counsel]. The cops didn't look at the T.V. to see if there was a recording that could have helped his client. *Well, there is one person on the face of this planet that knows that system*, so I'm sure [defense counsel], if he wanted to, he could have checked to see if there was a tape there. Maybe the thing doesn't record. Maybe it is just a camera hooked up to a T.V. Don't know. But he certainly would have

---

[2]*Griffin v. California* (1965) 380 U.S. 609.

been in the best position to go, 'Hey, there is a tape there. Let me look at the tape.'" (Italics added.)

Anderson asserts it "is reasonably likely that the jury would have interpreted [the italicized remark] as a comment on the defendant's failure to take the stand and testify in his own defense." We disagree.

Considering the prosecutor's comment in its entirety, the only reasonable interpretation is that defense counsel (who placed the existence of technological evidence in issue during his argument), had the best access to the video system and the person with knowledge of how the system worked. Accordingly, if the video system recorded events of the day of the search, and those events were important to the defense, defense counsel could/would have obtained the tape and introduced it (or evidence of the technology's capability) into evidence. The prosecutor's argument was a comment on the state of the evidence coupled with the defense's failure to introduce evidence counsel had brought up during argument—evidence counsel had equal or better access to. *Griffin* does not extend to "to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Valdez* (2004) 32 Cal.4th 73, 127.) As the prosecutor's comment was not about defendant's failure to testify, no *Griffin* error occurred.

However, even were we to assume in the abstract that the prosecutor's comment constituted a hyper-technical violation of *Griffin*, appellant's failure to object during the prosecutor's argument constitutes waiver. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006.) A defendant cannot complain on appeal of error by a prosecutor unless he or she made an assignment of error on the same ground in a timely fashion in the trial court and requested the jury be admonished to disregard the impropriety. (*Ibid.*)

Finally, were we to ignore the waiver/forfeiture issue, appellant suffered no prejudice. Any Griffin error, assuming it occurred in this case, was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)

12.

*Custody credits*

We now return to the issue we identified in our review of the file. At sentencing, the trial court failed to award Anderson any custody credits or to explain why none were awarded. The minute order does not address custody credits, and the abstract of judgment indicates no custody credits were awarded. The only reference to custody credits we could find in the record is in the probation officer's report. This reference states, "Credits applied to CRF39701."

However, the record indicates that, at the time of the sentencing hearing in this case, case No. CRF39701 had not been tried. Accordingly, the trial court could not know if that case would ever proceed to trial or would result in a conviction. Under these circumstances, it would appear Anderson was entitled to an award of custody credits in this case. (Pen. Code, §§ 2900.5, 4019.)

The parties both agree with our proposed disposition to remand the matter to the trial court to permit it to address the matter. The record is insufficient to permit us to determine whether Anderson is entitled to any presentence custody credits or, if he is entitled to credits, the amount that should be awarded. We recognize that Anderson may not be entitled to any custody credits if he was incarcerated when he was charged in this case, but the record suggests this was not the case. Accordingly, we will remand the matter to the trial court to either award Anderson the custody credits to which he is entitled or to create a record explaining why Anderson is not entitled to any custody credits.

## *DISPOSITION*

The matter is remanded to the trial court to award Anderson custody credits, if any, to which he is entitled or to explain why he is not entitled to any custody credits. The judgment is affirmed in all other respects.

13.