No. 94,400

STATE OF KANSAS, *Appellee*, v. KIRK T. WILSON, *Appellant*.

(130 P.3d 48)

Opinion filed March 17, 2006.

*Michael G. Highland* was on the brief for appellant.

*Rex L. Lane*, special prosecutor, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Kirk Wilson appeals his conviction for first-degree premeditated murder, claiming: (1) The evidence was insufficient; (2) the trial court erroneously admitted evidence of a witness' polygraph test; (3) the prosecutor committed misconduct during clos-

ing arguments; and (4) a law enforcement officer erroneously testified about the credibility of a witness.

Kirk Wilson was convicted of the premeditated first-degree murder of Kurt Boldridge. Wilson and Boldridge had both been married to the same woman, Sandra White. Wilson was married to Sandra first. Before divorcing in 1991, Wilson and Sandra had a son named Matt. Sandra was married to Boldridge from October 1998 to October 1999, a time in which Wilson was incarcerated. Wilson's son Matt lived with Sandra and Boldridge during their marriage. Wilson was released from prison on March 13, 2000.

On March 24, 2000, Boldridge's mother contacted the Atchison County sheriff's office and requested that they check on Boldridge's welfare because she had not seen or heard from him in nearly a week. When officers reached Boldridge's house they could smell the decay of a dead body from outside the house. The house was secure, and there was no evidence of forced entry. Because all of the windows were locked, sheriff's deputies had to break part of the glass from a window to enter the house.

Deputies discovered Boldridge's body on the bed with a comforter completely covering him. The body was decayed enough that the coroner could not immediately determine the cause of death at the scene, so he ordered an autopsy. Besides Boldridge's dead body, nothing else in the house appeared out of place. Nothing appeared to be missing, and there was no evidence of a fight or a struggle.

An autopsy established that Boldridge died from a shotgun blast to his left temple. There was wadding from the shotgun shell inside Boldridge's head, indicating that he had been shot at close range. There were no other injuries on his body. Insect larvae in Boldridge's body indicated that he had been dead for at least 3 days and possibly longer.

News of the gruesome discovery leaked out quickly. Wilson's current wife Kim heard about Boldridge's death within hours of the discovery of his body and telephoned her sister to inform her of Boldridge's death and advise her that she thought Wilson was involved. Kim's sister immediately contacted the Atchison police to report Kim's statements.

The investigator for the sheriff's department interviewed Wilson on March 28, 2000. Wilson denied any involvement in Boldridge's death, but stated that he heard about it on the weekend of March 18, 2000, 6 days before Boldridge's body was discovered.

In August 2000, Kim called police because Wilson had beaten her. Kim reported that while he was attacking her, Wilson stated that he had killed Boldridge and they were coming to arrest him for that, so he might as well kill her too.

John Goodpasture was sleeping on the Wilsons' couch while Wilson was beating Kim. After beating Kim, Wilson attacked Goodpasture and began beating him. Wilson drug Goodpasture into the bedroom and accused him of having an affair with Kim. During the fight, Wilson told Goodpasture, "if you think what happened to that nigger was bad, wait until you see what happens to you, and Gary [Skeen] [is] going to get it twice as bad." Fearing for his life, Goodpasture jumped through the glass in the bedroom window to escape from Wilson's fury.

Soon after Wilson beat Goodpasture, Goodpasture started talking to police about Wilson's involvement in Boldridge's death. According to Goodpasture's story, Goodpasture and his friend Gary Skeen were at their friend Harold Gillis' house when Wilson arrived at approximately 1 a.m. on March 19, 2000. Wilson was very upset, proclaiming that Boldridge had made Wilson's son Matt perform oral sex on Boldridge. Goodpasture stated that Boldridge's current wife Lisa had informed Wilson about the alleged abuse of Wilson's son. Wilson was so upset that he said he was going to kill Boldridge and showed Goodpasture a gun that was tucked in his pants. Lisa Boldridge arrived at the Gillis' house after Wilson and encouraged Goodpasture to participate in killing Boldridge by telling him that Boldridge had cocaine and Goodpasture could have it in return for his participation.

Wilson, Goodpasture, Gary Skeen, and Lisa Boldridge left Gillis' house and drove to Boldridge's house. When they arrived, Lisa Boldridge let the other three into the house and led them to the bedroom, where Boldridge was sleeping. Lisa got a shotgun and some shells and gave them to Wilson. Wilson approached Boldridge as he lay sleeping and shot him. Afterwards, Goodpasture

and Skeen looked briefly for the cocaine but decided to leave before finding anything.

Wilson, Skeen, and Goodpasture left in one car and drove to the Atchison park on the Missouri River. Lisa Boldridge left in another car and met the others at the park. Wilson threw the shotgun into the Missouri River. Although Goodpasture told law enforcement several different versions of the story and admitted that he lied to law enforcement several times, he insisted that his story implicating Wilson as the shooter was truthful.

The State filed a complaint/information charging Wilson with first-degree premeditated murder in December 2000. At trial, the State relied on testimony from Kim and Goodpasture to establish Wilson's involvement in Boldridge's death. In addition to testifying that Wilson admitted to killing Boldridge, Kim testified that Wilson began checking the newspaper for articles about Boldridge's death before Boldridge's body was discovered.

To impeach Goodpasture's testimony, Wilson elicited evidence that Goodpasture had entered into a plea agreement allowing him to plead guilty to a severity level 7 felony with a sentence of probation in return for his testimony against Wilson. Goodpasture testified that he would do almost anything to avoid going to prison for murder. Wilson also impeached Goodpasture with the various stories and lies he told to law enforcement. In response, Goodpasture testified that he lied until he knew he had to pass a polygraph test.

After less than 7 hours of deliberation, the jury found Wilson guilty of first-degree premeditated murder. The district court sentenced Wilson to life in prison with no possibility of parole for 25 years. Wilson appeals his conviction. Wilson's appeal is before us pursuant to K.S.A. 22-3601(b)(1).

## Sufficiency of the Evidence

For his first issue, Wilson argues that there is insufficient evidence to support his conviction. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in a light most favorable to the prosecution, the appellate court is convinced that

a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jackson*, 280 Kan. 16, 39, 118 P.3d 1238 (2005).

Wilson argues that the State's eyewitness, Goodpasture, lacked credibility because he had given several conflicting accounts and had received a favorable plea agreement from the State which reduced his sentence from life in prison to probation. This argument asks us to reweigh the evidence and pass on the credibility of the witnesses. We do not perform that function. The jury is charged with the responsibility of weighing the evidence and determining witness credibility. An appellate court does not substitute its judgment on those matters. *Jackson*, 280 Kan. at 39-40.

In *State v. Schlicher*, 230 Kan. 482, 639 P.2d 467 (1982), the defendant argued that his conviction for first-degree premeditated murder should be reversed because the evidence was insufficient. Schlicher argued that the State's eyewitness was unreliable because he had told a variety of inconsistent and conflicting stories and had been granted immunity in exchange for his testimony. Schlicher's defense counsel thoroughly cross-examined the eyewitness, highlighting the eyewitness' inconsistencies and bias. Although the State relied on its eyewitness to establish all of the elements of the crime, the State also produced evidence that Schlicher had made incriminating statements to other people, indicating his knowledge of the crime. Noting that the trial court had given the jury an appropriate cautionary instruction on accomplice testimony, the *Schlicher* court concluded that there was sufficient evidence to support Schlicher's conviction. 230 Kan. at 494.

The facts in this case are similar to those in *Schlicher*. Goodpasture's testimony was inconsistent with some of his prior statements to the police, and Goodpasture had been given a favorable plea agreement in exchange for his testimony. Wilson's defense attorney vigorously cross-examined Goodpasture regarding his plea agreement and his various conflicting and contradictory statements.

The State relied on Goodpasture's testimony to establish all of the elements of the offense but also introduced evidence that Wilson had made incriminating statements to other people. The State

presented testimony from Wilson's wife and the case investigator to demonstrate Wilson's knowledge of and admission to Boldridge's murder. Wilson's wife testified that Wilson admitted killing Boldridge and threatened to kill her as well. The investigator for the sheriff's department testified that Wilson admitted hearing about Boldridge's death on the weekend of March 18th, nearly 1 week before Boldridge's body was discovered on March 24th. The investigator also testified that Wilson admitted joking with a third party about killing Boldridge.

Like the trial court in *Schlicher*, the trial court in this case gave the jury a cautionary instruction on accomplice testimony, advising the jury to "consider with caution the testimony of an accomplice." We conclude that when the evidence is viewed in a light most favorable to the State, there is sufficient evidence to support Wilson's conviction.

### Evidence of a Polygraph Examination

Next, Wilson argues that his conviction should be reversed because Goodpasture referred to taking a lie detector test in his testimony. Goodpasture's comments about a polygraph test occurred in the following colloquy:

"Q. Why was it that eventually several months later you did provide the information to law enforcement?

"A. Well, I was messing up, getting nervous. I opened my mouth, flunked a lie detector test to a degree. And, to top it off, I think—I believe—[Wilson] was planning on killing me at some point in time mainly over that, that night that we got into it. That's it. I've had it enough."

Wilson did not object to Goodpasture's comment. Further, Wilson's defense counsel elicited the following testimony regarding Goodpasture's polygraph test during his cross-examination:

"Q. But you didn't tell that to Special Agent Morgan?

"A. No, I didn't. I was hiding several times. I was hiding. I didn't come out and tell the whole truth until it was time to do the lie detector test. I had to pass it. And I knew I had --

"Q. You had to pass the lie detector?

"A. I was trying to figure out a way out of it the whole time.

"Q. You were coming up with what, a story that you could tell the police that they would believe, is that correct?

"A. To limitation. I told them basically the truth through it, though. There was a lot of truth involved when I was telling them."

"Q. At which event was it the truth? I mean, you gave six or seven different—

"A. Deceptive in a lot of ways, yes.

"Q. Yes, Do you recall telling Agent Morgan that night that you didn't know if Kirk Wilson was responsible for the murder of Kurt Boldridge?

"A. Nope.

"Q. And that was the truth?

"A. No, it wasn't the truth.

"Q. So you've been lying throughout all of this?

"A. Yeah. Like I said, up until the time I took the lie detector test. I cannot pass it without telling the truth. And I knew it."

Wilson's defense counsel then requested a bench conference, where Wilson's counsel stated:

"He's begging me to ask questions about the lie detector.
"He did not pass it.
"It was deceptive.
"And I did not ask him about a lie detector.
"He volunteered it."

The trial court then informed Wilson's counsel that it was inadmissible and asked counsel to advise Goodpasture to "delete his references to the lie detector." Wilson's counsel replied that he did not want to leave the jury with the impression that Goodpasture passed the lie detector test and requested permission to explore that subject. The State agreed with Wilson's counsel, told the court that the parties would have to stipulate to admitting the testimony, and noted that the agent who performed the polygraph examination was subject to subpoena. However, Wilson's counsel did not pursue the issue any further either with Goodpasture or the agent who conducted the polygraph test.

In *State v. Kesselring*, 279 Kan. 671, 689, 1112 P.3d 175 (2005), this court concluded that the defendant could not complain about the admission of testimony regarding polygraph examinations on appeal when he did not object to the testimony at trial and his defense counsel elicited the testimony. The *Kesselring* court noted that the invited error rule precludes a defendant from raising an issue on appeal based on statements elicited by his or her defense counsel at trial. The *Kesselring* court stated that "[a]lthough the

invited error rule cannot be used as a pretext for violating a defendant's constitutional rights, any error in the mention of the polygraph examinations does not rise to the level of constitutional error." 279 Kan. at 689.

*Kesselring* supports our conclusion that Wilson's claim of error is without merit. Goodpasture's initial comment about a polygraph examination indicated that he had failed the examination. Goodpasture's comments about passing a polygraph test were initiated by Wilson's counsel. Even though the State agreed to stipulate to the admission of evidence regarding Goodpasture's polygraph examination, Wilson's counsel did not pursue the issue. Any reference to Goodpasture passing a polygraph examination was invited error and does not warrant the reversal of Wilson's conviction.

## Prosecutorial Misconduct

Next, Wilson claims that the prosecutor committed misconduct during closing argument. Wilson did not object to any of the statements he now raises on appeal. If the prosecutor's statements violate the defendant's right to a fair trial and deny the defendant's Fourteenth Amendment right to due process, this court can find reversible error despite the lack of a contemporaneous objection. *State v. Betts*, 272 Kan. 369, 384-85, 33 P.3d 575 (2001).

"When reviewing an allegation of prosecutorial misconduct, an appellate court applies a two-step analysis to determine whether a prosecutor's comments have denied a defendant his or her constitutional right to a fair trial. First, the court must determine whether the remarks were outside the considerable latitude that the prosecutor is allowed in commenting on the evidence. Second, the court must decide whether the comments were so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby constituting plain error requiring reversal." *State v. Harris*, 279 Kan. 163, 173, 105 P.3d 1258 (2005).

In determining whether the comments denied the defendant's right to a fair trial, the court must consider the following three factors:

"(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors." *State v. Elnicki*, 279 Kan. 47, 64-65, 105 P.3d 1222 (2005).

Wilson raises two arguments to establish prosecutorial miscon-duct. First, Wilson complains that the prosecutor was trying to bolster Goodpasture's credibility by inferring that he passed a pol-ygraph test. Wilson objects to the following statements:

"[Goodpasture] admitted he lied on several occasions, from March 30 forward, until finally he realized he was in so deep that he had no way to get out but to tell the truth.

. . . .

"[Goodpasture] simply realized that he was knee deep into this, there was no way out, except to tell the truth.

"And it took awhile for him to realize that.

"And it took even longer for him to get all the truth out.

"Eventually it did because there was just no other way for him.

"Once he started with the truth, then all the lies had to go.

. . . .

"And you have to take into consideration, ladies and gentlemen, you know his motivation for wanting or not wanting to tell a story throughout time."

As a fundamental rule of closing arguments, prosecutors must confine their comments to matters in evidence. Commenting on facts not in evidence is clearly improper. However, a prosecutor is allowed considerable latitude in discussing the evidence and draw-ing reasonable inferences based on the evidence. *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2004). The State argues that the prosecutor's statements merely restate Goodpasture's testimony and are, therefore, fair comment on the evidence.

Goodpasture testified that he had been lying throughout the various statements he had made to law enforcement and admitted that his statements were inconsistent. Goodpasture testified about several reasons for his deceptive and inconsistent statements. One reason Goodpasture lied was to protect himself and his friend Gary Skeen. Goodpasture also testified that he lied because he was afraid of "winding up in jail with them or getting killed or [his] kids getting hurt, [or] going to prison for life." On direct examination, Good-pasture testified, without objection, that he told the truth because he was getting nervous and failed a polygraph test. However, on cross-examination, Goodpasture testified that his statements changed a lot "until [he] took the lie detector test. And they stayed the same since then." Goodpasture also testified on cross-exami-

nation that he did not think he could pass the lie detector test without telling the truth.

The prosecutor's statements are confined to the evidence admitted at trial. Goodpasture's reference to passing a polygraph test was in response to questioning by Wilson's defense counsel. The prosecutor's argument does not highlight or specifically refer to Goodpasture's statements about passing a polygraph test. Rather, the prosecutor was referring to the various reasons that Goodpasture asserted for lying.

The prosecutor's comments are within the wide latitude prosecutors are allowed for commenting on the evidence and making reasonable inferences. Thus, Wilson's argument fails to pass the first step in the test for prosecutorial misconduct, and we need not consider whether the comments were so gross and flagrant as to prejudice the jury against Wilson and deny him a fair trial.

For his second argument, Wilson claims that the prosecutor misstated the definition of reasonable doubt by stating:

> "I want you to look at the evidence, remember all the testimony that you heard, and go back to that definition of reasonable doubt that, unfortunately, no one can say in precise words what it is.
> "You just have to intuitively know when you see it."

Wilson failed to object to this comment but now argues that the prosecutor equated reasonable doubt with mere intuition. We believe this argument misrepresents the prosecutor's statement. Essentially, the prosecutor was saying that, although reasonable doubt does not have a precise definition, jurors will instinctively know it when they see it.

In *State v. Finley*, 273 Kan. 237, 248, 42 P.3d 723 (2002), the prosecutor made the following statement during closing argument:

> " 'I would submit to you that a reasonable doubt is really nothing more than a fair doubt that's based on reason and common sense and arises from the status of the evidence. It's impossible for me to prove everything to you by an absolute certainty. At the same time, a defendant should not be convicted just on speculation and conjecture, but you have much more than that in this case.' "

Although the prosecutor improperly implied that a conviction could be based on more than suspicion and conjecture, the *Finley*

court concluded that the prosecutor's comment, as a whole, conformed to the acceptable definition of reasonable doubt. The *Finley* court held that the prosecutor's comment did not deny the defendant a fair trial. 273 Kan. at 249.

We note that the Pattern Instructions do not include a separate instruction for the definition of "reasonable doubt." PIK Crim. 3d 52.04. In *State v. Walker*, we stated that reasonable doubt can be appropriately explained by stating that " ' "[N]o definition or explanation can make any clearer what is meant by the phrase 'reasonable doubt' than that which is imparted by the words themselves." ' " 276 Kan. 939, 956, 80 P.3d 1132 (2003) (quoting *State v. Bridges*, 29 Kan. 138, 141 [1882]).

Noting that the prosecutor's statement in this case is far less egregious than the prosecutor's statement in *Finley,* we conclude that it complies with the appropriate explanation for reasonable doubt stated in *Walker*. Thus, the prosecutor's statement properly states the law regarding reasonable doubt. Prosecutorial comments that properly state the law are not outside the wide latitude prosecutors are allowed in closing argument. Wilson's claim of error is without merit.

### Witness' Veracity

Wilson appears to have raised an issue in passing while arguing that the trial court should not have admitted testimony about Goodpasture's polygraph examination. Wilson's brief states:

"During a state's witness's testimony, that witness, a law enforcement officer, testified as to the truthfulness of Goodpasture's statements. The judge admonished the jury to disregard those remarks."

The State addressed this comment in its brief, but Wilson did not argue the issue or cite to any authority to support the issue. When a party presses a point without supporting authority or without showing why the argument is sound despite the lack of authority, we have concluded that the issue is deemed waived or abandoned. *State v. Gleason*, 277 Kan. 624, 655, 88 P.3d 218 (2004).

Even if Wilson had properly briefed and argued this issue, we conclude that there was no reversible error. Immediately after the

officer's statement, the trial judge called counsel to his bench and stated, "You can't have him give veracity of another witness." The prosecutor stated that his question was meant to inquire into the accuracy of Goodpasture's statements rather than the veracity. Defense counsel did not object but requested that the court instruct the jury to disregard the officer's remark. Immediately after the bench conference the trial judge gave the jury the following instruction:

"It's really up to the jury to determine the weight and credit of the testimony of a witness.

"One witness cannot testify as to the veracity and/or the lack of veracity of another witness.

"That's your job.

"So any remark by [the officer] that Mr. Goodpasture was truthful or not truthful is to be disregarded by you because, again, it's for you to decide as to whether a witness is being truthful or not truthful."

One witness may not express an opinion regarding the credibility of another witness. The jury is responsible for determining witness credibility. Consequently, evidence regarding the credibility of another witness is disallowed as a matter of law. *State v. Elnicki*, 279 Kan. at 53-54. However, when a witness provides an unsolicited, unresponsive, and improper remark to a proper question resulting in the erroneous disclosure of inadmissible evidence, reversible error depends on whether a limiting instruction was given and the degree of prejudice to the defendant. *State v. Rice*, 261 Kan. 567, 593, 932 P.2d 981 (1997) (concluding there was no reversible error from a police officer's unsolicited comment regarding the defendant's refusal to talk without an attorney because the trial court gave a limiting instruction and the defendant was not prejudiced).

Although the officer's comment regarding Goodpasture's veracity was unsolicited, unresponsive, and improper, the comment was in response to a proper question. The trial court spontaneously, and we note, impressively recognized the problem and immediately admonished the jury to disregard the comment. The court then instructed the jury that the determination of a witness' credibility was its responsibility. Wilson was not prejudiced by the remark. We conclude that the trial court's immediate recognition of

the violation and instruction regarding the statement cured the error.

Affirmed.