NOT DESIGNATED FOR PUBLICATION

No. 112,722

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BENNY ROE BUSH, III,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed October 28, 2016. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Christopher R. Scott*, assistant county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., POWELL, J., and STUTZMAN, S.J.

*Per Curiam*:  Benny Roe Bush, III, appeals his conviction and sentence on five drug related charges. On appeal, Bush contends that evidence seized as a result of a search warrant should be suppressed because the affidavit in support of the warrant was not sufficient to support a finding of probable cause. He also contends that the prosecutor committed error during voir dire and during his closing argument to the jury. Finally, Bush contends the district court should not have considered his criminal history in calculating his sentence. Finding none of these contentions to have merit, we affirm Bush's conviction and his sentence.

1

On April 23, 2012, Matthew Caddell confidentially informed Sergeant Mike Wehmeyer of the Leavenworth County Sheriff's Department that Bush was in possession of marijuana and "could get whatever quantity of marijuana was needed." Over the next 3 days, Caddell reported to Sergeant Wehmeyer two additional incidents involving Bush allegedly selling drugs. After performing surveillance at 623 Dakota Street, officers determined that Rachel Castle—who was Bush's girlfriend at the time—rented the house, and officers confirmed that Bush resided there. Officers also confirmed that the Dakota Street residence is within 1000 feet of a school.

On May 11, 2012, Sergeant Wehmeyer arranged for Caddell to perform a controlled drug buy at 623 Dakota Street. Prior to completing the drug buy, Sergeant Wehmeyer met with Caddell, searched him for contraband, and provided him with audio transmission equipment. Finding no contraband on Caddell, Sergeant Wehmeyer provided him with cash and instructed him to purchase some marijuana and/or prescription pills from Bush.

Sergeant Wehmeyer saw Caddell enter the Dakota Street residence and listened as the drug buy was taking place. After Caddell left the residence, he met with Sergeant Wehmeyer and provided the sergeant with what appeared to be marijuana and prescription pills. Caddell indicated he purchased these items from Bush. Sergeant Wehmeyer field-tested the vegetation and it tested positive for marijuana. The Kansas Bureau of Investigation (KBI) later confirmed this fact and identified the pills to be hydrocodone.

On May 23, 2012, Sergeant Wehmeyer arranged for Caddell to perform a second controlled drug buy at the Dakota Street residence. The sergeant again met with Caddell, searched him for contraband, and provided him with audio transmission equipment.

2

Likewise, Sergeant Wehmeyer again provided the informant with cash and instructed him to purchase marijuana. As he had done previously, Sergeant Wehmeyer observed the informant enter the Dakota Street residence and again listened to the drug buy. A short time later, Caddell provided Sergeant Wehmeyer with a substance suspected to be marijuana that he indicated Bush sold to him. Sergeant Wehmeyer field-tested the substance and it tested positive for marijuana. The KBI subsequently confirmed that the substance was indeed marijuana.

On the same day that the second controlled drug buy was completed, Sergeant Wehmeyer filed an affidavit and application for a search warrant. The affidavit alleged unlawful drug activity, including the distribution of drugs within 1000 feet of a school. Moreover, Sergeant Wehmeyer described the controlled drug buys and the events leading up to them. In addition, Sergeant Wehmeyer indicated that the confidential informant— later identified as Caddell—who had participated in the controlled drug buys had "assisted the Sheriff's Office by conducting ten controlled purchases of various narcotics for several different cases."

The district court issued the search warrant, and officers executed it the following day. During the search, law enforcement officers found Bush at the residence and detained him while the officers conducted the search. Sergeant Wehmeyer took Bush to a nearby police vehicle and began to interview him. Evidently, Bush volunteered that there was marijuana in the house. After Sergeant Wehmeyer informed Bush of his *Miranda* rights, Bush led officers to the marijuana he had mentioned. He also told the officers that prescription medications found in the house belonged to his girlfriend. In addition, Bush led officers to approximately $3,300 in cash that was hidden in various locations within the residence. The money used in the controlled buy was not located within the residence. The officers also seized rolling papers and ammunition from the residence but no firearms were located in the house.

3

Based on the controlled drug buys and the results of the search of the Dakota Street residence, the State charged Bush with five counts:

- two counts of distributing marijuana within 1000 feet of school property, in violation of K.S.A. 2011 Supp. 21-5705(a)(4), (c)(1)(A);

- one count of possession of marijuana with intent to distribute within 1000 feet of school property, in violation of K.S.A. 2011 Supp. 21-5705(a)(4), (c)(1)(A);

- one count of distributing Hydrocodone within 1000 feet of school property, in violation of K.S.A. 2011 Supp. 21-5705(a)(4), (c)(1)(A); and

- one count of no drug tax stamp, in violation of K.S.A. 79-5204.

Prior to trial, Bush filed a motion to suppress evidence gathered as a result of the search warrant. Bush claimed the warrant lacked probable cause and argued that the information provided by the confidential informant lacked indicia of reliability. He also argued that the affidavit in support of the warrant was unreliable because it failed to include information about any arrangement Caddell had with Sergeant Wehmeyer nor did it accurately disclose the informant's criminal history.

On May 28, 2014, the district court held an evidentiary hearing on the motion to suppress. The judge—who appears to be the same judge who issued the warrant—heard the testimony of Sergeant Wehmeyer regarding his investigation into Bush as well as his experience working with Caddell in the past. The State also offered, and the district court received, the affidavit in support of the search warrant and an audio recording of Bush's statements to Wehmeyer during the search. After considering the evidence and arguments

4

of counsel, the district court found that the affidavit in support of the search warrant provided probable cause and denied the motion to suppress.

After the evidentiary hearing, but prior to trial, the State revealed Caddell's identity to Bush. At the same time, Bush learned Caddell was the subject of a pending criminal investigation related to the distribution of controlled substances.

At the jury trial, the State presented the testimony of Sergeant Wehmeyer, who testified about his investigation; a KBI chemist, who testified regarding the substances purchased during the controlled buy as well as the substances found during the search; a county employee, who testified that the Dakota Street residence is located within 1000 feet of a school; and, a Sheriff's Department technician, who testified about the chain of custody of the physical evidence presented in this case.

The State also called Caddell as a witness. He testified that he knew Bush on a personal basis and that he had assisted Sergeant Wehmeyer with the two controlled drug buys involving Bush. In addition to describing the controlled drug buys, Caddell also testified regarding his experience with law enforcement. In addition to serving as an informant in several cases, Caddell had previously worked as a dispatcher. Caddell testified that his criminal history included convictions for theft and forgery. Caddell further revealed he had pled guilty to distribution of narcotics stemming from an incident that occurred on November 7, 2011, and that his sentencing on that case was scheduled for the following day. He explained that he had not disclosed the November 2011 arrest to Sergeant Wehmeyer because charges had not yet been filed at the time of the two controlled drug buys involving Bush.

After the State rested, Bush presented the testimony of Castle, his former girlfriend who was leasing the Dakota Street residence at the time of the two controlled drug buys and the execution of the search warrant. She testified that some of the cash

5

found in the house during the search belonged to her. Furthermore, she testified that Bush received the remainder of the cash as proceeds from the sale of a car. In addition, she testified that Caddell had bought a car from Bush. According to Castle, Caddell failed to make timely payments to Bush but instead Caddell offered to provide drugs to Bush in exchange for a car payment.

Ultimately, the jury convicted Bush on all five charges. Following the jury trial, Bush moved for a new trial, and in the alternative, a judgment notwithstanding the verdict. At a hearing held on August 15, 2014, the district court denied the motion. On the same day, the district court sentenced Bush to 78 months in prison and 36 months of postrelease supervision. Thereafter, he timely filed this appeal.

ANALYSIS

*Motion to Suppress Evidence*

On appeal, Bush contends that the district court erred by failing to suppress evidence obtained during the search of the Dakota Street residence. Specifically, Bush argues that the affidavit in support of the search warrant did not contain a substantial basis for concluding probable cause existed. He also argues that the affidavit contained false or misleading information. In particular, Bush suggests that Sergeant Wehmeyer should have included information regarding Caddell's arrest in November 2011 for distribution of a controlled substance as well as information regarding Caddell's prior conviction for a crime of dishonesty.

When reviewing a motion to suppress evidence, we apply a bifurcated standard. Specifically, we determine whether the factual findings underlying the district court's decision are supported by substantial competent evidence, while the ultimate legal conclusion drawn from those factual findings are reviewed de novo. *State v. Reiss*, 299

6

Kan. 291, 296, 326 P.3d 367 (2014). When a defendant challenges an affidavit supporting a search warrant, the reviewing court must determine whether the issuing magistrate had a substantial basis for finding probable cause. *State v. Adams*, 294 Kan. 171, 180, 273 P.3d 718 (2012). This standard, which is inherently deferential, asks whether the affidavit provided a substantial basis to determine that there was "'a fair probability that evidence will be found in the place to be searched.'" 294 Kan. at 180.

Generally, courts presume an affidavit supporting a search warrant to be valid and accurate. See *Franks v. Delaware*, 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). For that reason, the subject of the search warrant usually cannot dispute the facts contained within that affidavit. See *Adams*, 294 Kan. at 179. However, a limited exception exists when the subject alleges that the affidavit contains either intentional lies, untrue statements demonstrating a reckless disregard for the truth, or material omissions. *Franks*, 438 U.S. at 171; *Adams*, 294 Kan. at 179.

"Allegations of negligence or innocent mistake" are an insufficient basis on which to find a search warrant to be unreliable. *Franks*, 438 U.S. at 171. Additionally, in the case of omissions from an affidavit, the missing information must be of a nature to render it unreliable. Nevertheless, if probable cause still exists after striking any false information from the affidavit or inserting any language omitted from the affidavit, the search warrant will remain valid. See *Franks*, 438 U.S. at 171-72; *State v. Schoonover*, 281 Kan. 453, 513, 133 P.3d 48 (2006).

When the information relied on for the application for a search warrant is received from an unquestionably honest citizen, it is entitled to a presumption of reliability. See *State v. Landis*, 37 Kan. App. 2d 409, 418-19, 156 P.3d 675 (2007). This presumption, however, is inapplicable when an informant is implicated in a crime and hopes to gain leniency by giving information to a law enforcement officer. 37 Kan. App. 2d at 419. When an informant hopes to gain leniency, a search warrant affidavit must establish the

7

informant's credibility or law enforcement officers must corroborate the information provided by the informant. 37 Kan. App. 2d at 419.

On appeal, Bush raises two alleged omissions. First, he argues that Sergeant Wehmeyer failed to include in the search warrant affidavit that Caddell had previously been convicted of a crime of dishonesty. Specifically, Bush suggests that Sergeant Wehmeyer should have disclosed in the affidavit that Caddell had previously been convicted of forgery. Second, Bush suggests that Sergeant Wehmeyer should have disclosed in the affidavit that Caddell had been arrested for distribution of a controlled substance in November 2011.

To begin, we note that we find nothing in the record on appeal that shows whether Sergeant Wehmeyer had actual knowledge of either Caddell's prior forgery conviction or his 2011 arrest for distribution of a controlled substance. As such, alleging he deliberately omitted this information from the affidavit is not a fair description. See *Schoonover*, 281 Kan. at 513 (requiring that the omission be material and deliberate). Likewise, we find nothing in the record on appeal that shows Caddell had hoped to receive leniency following his arrest in November 2011 for distribution of controlled substances. Even if Caddell did hope to receive leniency following the November 2011 arrest, Sergeant Wehmeyer corroborated the information he received from Caddell regarding Bush selling drugs by arranging the two controlled drug buys conducted prior to seeking a search warrant.

In particular, the record reflects that Caddell made two controlled buys from Bush at the Dakota Street residence—the second of which was conducted on the same day that the district court issued the search warrant. Using a typical protocol for such transactions, Sergeant Wehmeyer searched Caddell prior to each of the drug buys and found that he possessed no illegal drugs. He then gave Caddell buy money and watched from a distance as the informant entered the house. In addition, Sergeant Wehmeyer wired Caddell with

an electronic monitoring device and listened as Caddell completed the drug buys. Shortly after each of the controlled drug buys, Caddell returned to Sergeant Wehmeyer and the sergeant searched him again. Although he no longer had the buy money, Caddell did return with marijuana and pills on the first occasion and with marijuana on the second occasion.

Under the circumstances presented, we find that even if the information about Caddell's past convictions had been included, the affidavit still was sufficient to provide a substantial basis for the issuing magistrate to determine that there was a fair probability that officers would find evidence of a drug crime involving Bush inside the Dakota Street residence.

*Prosecutorial Error*

Bush also contends on appeal that the prosecutor committed error on two occasions—first during voir dire and again during closing arguments. Comments made by counsel during voir dire and closing arguments are not evidence. The Kansas Supreme Court recently clarified the standard of review for prosecutorial error in *State v. Sherman*, 305 Kan ___, 378 P.3d 1060 (2016). In analyzing claims for prosecutorial error, we are to follow a two-step process:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*[*v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error

complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' *State v. Sprague*, 303 Kan. 418, 430, 362 P.3d 828 (2015)." *Sherman*, 378 P. 3d at 1075.

*1. Voir Dire*

Bush complains of the following exchange involving the prosecutor and potential jurors during voir dire:

"[PROSECUTOR]: Raise your hand if you've heard of reasonable doubt. Those of you who have served on a criminal jury before have probably heard the term *reasonable doubt*. And what does it mean? I can't tell you that. That's for you to decide. You have to decide what a reasonable doubt is.

"It doesn't necessarily mean beyond all doubt, but often people hear it beyond a reasonable doubt. Again, you'll hear the evidence in this case, and you have to decide, Is there a reasonable doubt? In my mind, is there a reasonable doubt on this case? There might be a doubt, but I don't think it's reasonable. If there's a reasonable doubt as to any element in the case, you must acquit on that particular charge, but that's for you to decide what's reasonable.

"We give another example of, you know, what's possible versus what's reasonable. I mean, you know, I could go out to the golf course today, and it's me, and I would say Tiger Woods, but—you know, he's hurt right now. But does anybody here play golf? Nobody? Okay.

"Juror 16. All right. So Martin Kaymer won the U.S. Open[,] right? I mean, just blew out the field, you know, last weekend, the whole time.

10

"PROSPECTIVE JUROR NO. 16:  Boring U.S. Open.

"[PROSECUTOR]:  Yes. Boring U.S. Open. So I could go out and play Martin Kaymer today. The odds may be, you know, one in a billion that I'd beat him, but, you know, it's possible I could beat him in 18 holes. Is that reasonable to think that I'm going to step up and beat Martin Kaymer in 18 holes of golf?

"PROSPECTIVE JUROR NO. 16:  No.

"[PROSECUTOR]:  It's possible. Is it reasonable to think that you're going to step up and beat him?

"PROSPECTIVE JUROR NO. 16:  No.

"[PROSECUTOR]:  Anything is possible, but is it reasonable to think that?

"PROSPECTIVE JUROR NO. 16:  Anything is possible; but in that situation, no.

"[PROSECUTOR]:  That's an example we use. And that's what you have to think is, [a]nything's possible, but what you have to decide is, is something reasonable? Is that a reasonable doubt in this case?"

Kansas courts have long held that no definition or explanation can make any clearer what is meant by the phrase "reasonable doubt" than which is imparted by the words themselves. *State v. Wilson*, 281 Kan. 277, 287, 130 P.3d 48 (2006) (quoting *State v. Bridges*, 29 Kan. 138, 141 [1883]). Unfortunately, "'[E]fforts to define reasonable doubt . . . usually lead to a hopeless thicket of redundant phrases and legalese, which tends to obfuscate rather than assist the jury in the discharge of its duty.'" *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 (2003) (quoting *State v. Acree*, 22 Kan. App. 2d 350, 356, 916 P.2d 61 [1996]). Accordingly, appellate courts have discouraged prosecutors from using analogies when discussing the burden of proof in a criminal case. *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010).

Using analogies to assist a jury in understanding reasonable doubt does not necessarily constitute prosecutorial error. *State v. Stevenson*, 297 Kan. 49, 298 P.3d 303 (2013). In *Stevenson*, the prosecutor began the discussion of reasonable doubt by saying that neither the court nor the attorneys would define the concept. The prosecutor used a sign that spelled out "Wheel of Fortune" with one letter missing to try to explain reasonable doubt, by demonstrating how the sign clearly spelled a recognizable phrase even with some gaps. The Kansas Supreme Court found that although it discouraged the use of the "Wheel of Fortune" analogy, it was not a misstatement of the law nor did it fall outside the wide latitude afforded to prosecutors. *Stevenson*, 297 Kan. at 54-55.

Here, the prosecutor emphasized before his analogy he could not define reasonable doubt for the jury. He then went on to state that the jury could have doubt and still convict someone if the doubt was not reasonable. Next, he proceeded to his analogy on whether it would be reasonable to think a weekend golfer like himself would beat a professional golfer at golf. Although it may be possible, he pointed out that it would not necessarily be reasonable for him to do so.

Similar to the "Wheel of Fortune" analogy in *Stevenson*, we do not find that the prosecutor's golf analogy is a misstatement of the law nor do we find that it falls outside the wide latitude afforded to prosecutors. Moreover, even if we assume the analogy was a misstatement of the law and the prosecutor exceeded the wide latitude allowed, we find Bush suffered no prejudice as a result.

The prosecutor was attempting to show by use of the golf analogy that the State's burden was to prove a defendant guilty beyond a reasonable doubt—not all doubt. The State used the analogy only during the voir dire stage of the proceedings and did not repeat it. In addition, we note that the district court appropriately instructed the jury prior to deliberations regarding the State's burden of proof as well as the fact that the statements of counsel are not evidence. Thus, we conclude that there was no reasonable

12

possibility that the analogy contributed to the verdict or affected Bush's right to a fair trial.

We do not endorse, however, the prosecutor's golf analogy and would discourage its use. In fact, we note that another panel of this court discouraged the use of this analogy in *State v. Peters*, No. 111,432, 2015 WL 5036711, at *3 (Kan. App. 2015) (unpublished opinion). In fairness, we note that the *Peters* case was decided after the trial of this case.

### 2. *Closing Arguments*

Bush also contends that the prosecutor committed prosecutorial error during closing argument. Specifically, Bush suggests that it was improper for the prosecutor to argue to the jury that it should consider the totality of the investigation—including the two controlled drug buys—in determining whether Bush intended to distribute the marijuana seized during the execution of the search warrant. He argues that the controlled drug buys constituted past conduct and, as such, the jury should not have considered them. Again, we will apply the two-step analysis set forth in *Sherman*, 378 P.3d at 1075.

Here, the distribution and possession with intent to distribute charges were related transactions. In fact, the warrant used to obtain the marijuana, cash, and other items found during the search was issued on the same day as the second controlled drug buy. In *State v. Cromwell*, 253 Kan. 495, 509, 856 P.2d 1299 (1993), the defendant was charged with two counts of first-degree murder. The district court allowed the State at trial to use evidence of one count to as evidence of identity on the other count and vice-versa. 253 Kan. at 508-509. On appeal, the Kansas Supreme Court found that an instruction directing the jury to only consider the evidence for the purposes of identity was unnecessary, as the evidence was independently admissible. 253 Kan. at 509.

13

Furthermore, the court found the instruction—which told the jury to consider each crime separately—was sufficient to guide the jury. 253 Kan. at 510.

As in *Cromwell*, the distribution and possession charges in the present case were tried at the same time, and the distribution evidence was independently admissible. Furthermore, like *Cromwell*, the district court in this case appropriately instructed the jury to consider each count separately. We find that this instruction was sufficient to guide the jury in this case. Thus, we conclude that the prosecutor did not commit error during his closing argument.

Even if we did find error, we do not find that Bush suffered prejudice in this case. As the Kansas Supreme Court recently noted, prosecutorial error is harmless "'where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 378 P.3d at 1075 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 [2012]. As the State points out, even if the jury did not consider the two controlled drug buys for the purposes of the possession with intent to distribute the marijuana found during the execution of the search warrant, there was still overwhelming evidence presented at trial in support of this charge. During the search, Bush voluntarily told Sergeant Wehmeyer that there was marijuana in the house and, in fact, officers located 36.2 grams of marijuana in a refrigerator. This is where Caddell told Sergeant Wehmeyer that the marijuana he purchased from Bush came from during one of the controlled drug buys. In addition, law enforcement officers found $3,300 in cash hidden in various places throughout the house. Moreover, there were covers on the windows of the house and ammunition was found in the laundry room.

As indicated above, the district court properly instructed the jury to consider each count separately. Furthermore, we presume that the jury followed the instructions given by the district court. See *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). Thus, based on the other evidence presented at trial as well as the instructions given to the jury,

14

we conclude that there was no reasonable possibility that the alleged prosecutorial error during closing arguments contributed to the verdict or affected Bush's right to a fair trial.

*Criminal History*

Finally, Bush asserts that the use of his prior criminal history to calculate his sentence without first proving it beyond a reasonable doubt to a jury violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S., 120 S. Ct. 2348, 149 L. Ed. 2d 435 (2000). But the Kansas Supreme Court has clearly decided this issue contrary to his argument in *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). This court is duty bound to follow Kansas Supreme Court precedent unless there is some indication the court is departing from its previous position, and our Supreme Court has consistently followed *Ivory*. See *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014); *State v. Baker*, 297 Kan. 482, 485, 301 P.3d 706 (2013). Thus, we conclude the district court did not err when it used Bush's criminal history to calculate his sentence.

Affirmed.