NOT DESIGNATED FOR PUBLICATION

No. 126,882

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LAUREN M. SCHWINDT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE judge. Submitted without oral argument. Opinion filed March 6, 2026. Affirmed.

*Lindsay Kornegay*, of Kansas Appellate Defender Office, for appellant.

*Kimberly A. Rodebaugh*, senior assistant district attorney, *Thomas R. Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., HILL and ARNOLD-BURGER, JJ.

HURST, J.: Lauren M. Schwindt phoned a friend while in custody and reported that an officer at the correctional facility sexually assaulted her. Her friend, believing Schwindt had been harmed, contacted officials who took Schwindt to a local hospital for examination. During that exam Schwindt decided to report the assault to law enforcement which eventually resulted in the State charging Schwindt with interference with law enforcement for false reporting. A jury convicted Schwindt of the charge, and Schwindt appeals the sufficiency of the evidence supporting her conviction.

1

On appeal, Schwindt does not claim that the State failed to prove her sexual assault allegations were false. Rather, she only attacks the sufficiency of the State's evidence of her culpable mental state. That is, Schwindt claims the State failed to prove that she *knew* the sexual assault allegations were false. While there was no direct evidence that Schwindt knew the allegations were false, the circumstantial evidence was sufficient to allow a rational fact-finder to have found Schwindt knew her reported allegations were false. Thus, the conviction is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

While in custody at the Reno County Correctional Facility, Schwindt told her friend, Maria, that a deputy at the facility sexually assaulted her. After the phone call, Maria contacted law enforcement and reported the assault. Detective Nick Smith investigated the allegation and ultimately concluded it was unfounded. Based on that investigation, the State charged Schwindt with interference with a law enforcement officer for falsely reporting that a law enforcement officer committed a crime. Schwindt was convicted after a jury trial, and she now appeals, claiming the State failed to present sufficient evidence to support her conviction.

*The SANE Visit and Sexual Assault Kit Test Results*

Schwindt met with a Sexual Assault Nurse Examiner (SANE), on July 15, 2019, who conducted a medical exam and recorded the details of Schwindt's allegations in her report. Schwindt told the nurse that on the night of July 14, she was called out of housing and believed she was being bonded out. Schwindt told her that she walked until she entered a dark room and saw an officer she recognized from a prior incident. The officer pulled her shirt up and used one hand to hold the shirt above her head to prevent her from using her hands. Schwindt told the nurse that the officer put his hand over her mouth, had her back pushed up against the wall, and faced her the entire time while he forcibly

sexually assaulted her. The nurse testified at trial that Schwindt could not recall whether the perpetrator ejaculated during the assault. She said Schwindt could not remember a lot of what happened as though she was in and out of consciousness. According to the nurse, Schwindt could not name the perpetrator but said that she recognized him from the "last time" and that he was "Caucasian."

The nurse testified that Schwindt was given the choice to report the assault to law enforcement or report anonymously. Schwindt wanted to report the assault to law enforcement. The State submitted several exhibits, including an "Authorization and Consent for Sexual Assault Medical Forensic Exam Reported to Law Enforcement" signed by Schwindt under the section stating: "I am choosing to make a report to law enforcement."

As to physical evidence, the nurse testified that on the information and history form, Schwindt indicated that she had bathed, showered, brushed her teeth, urinated, and consumed liquids—all of which can cause loss of DNA evidence. Schwindt alleged that the assault occurred somewhere around 24 hours before the exam, and the nurse testified that though they could potentially collect physical evidence such as DNA within that timeframe, it did not mean they would find evidence. The nurse swabbed various areas of Schwindt's body for potential DNA, including her chest, because Schwindt reported the perpetrator had licked her chest. She also collected fluid from Schwindt's vagina, noting no acute vaginal injuries.

The nurse saw bruising on Schwindt's breasts and upper thighs, which was photographed and marked on the anatomical drawings. The nurse testified that Schwindt was "trembling" through most of the exam and became "tearful during the genital exam." The State submitted five images taken during the examination including images of obvious bruises on Schwindt's chest and thigh. A forensic scientist from the Kansas Bureau of Investigation also testified that she examined the sexual assault kit on October

13, 2019, and did not find the presence of seminal fluid. The vaginal swabs also underwent a second, microscopic exam, which showed no sperm cells.

*Detective Smith's Investigation*

The correctional facility had video cameras in most areas excluding bath and shower rooms. Detective Smith testified that he reviewed videos of Schwindt's movements in the jail from the time of her booking until she appeared in municipal court on the morning of July 15. Detective Smith testified about the contents of 13 DVDs of surveillance footage during Schwindt's stay that showed her activities throughout the jail. According to Detective Smith, the video surveillance footage showed there was no opportunity for the assault to occur during Schwindt's time in jail.

Detective Smith said he watched "every second of. . . when she entered booking, to when she left for municipal court." He testified that he only lost visual of Schwindt during that time when she was in her jail cell—where there was no camera angle—and a short period of time while Schwindt was in booking. According to Detective Smith, Schwindt's door did not open around 11 p.m. on the night of July 14 and there was no opportunity for the assault to have taken place while she was in the facility.

*First Interview of Schwindt*

Detective Smith met with Schwindt for the first time on July 15, 2019, after he had reviewed the video surveillance and spoken with Maria. Schwindt's description of the events was similar to the description provided by the nurse. Although Schwindt could only remember parts of the event, she explained that she "knew it happened—the way [she] felt." She also stated that she knew what happened was not a dream; her memory issues were the same as last time she had an issue at the jail, but this time she remembered more, including the actual act.

4

Detective Smith asked for more details, which Schwindt provided. She described the booking process, the day of the incident, and the location of her room. She said that she was told over the intercom to leave her pod and go down the hall, which she did. She did not remember which direction it was, and she reiterated that she only remembered bits and pieces. Detective Smith asked how Schwindt knew which way to go since she was not sure; Schwindt said a door just opened and that she walked through.

Schwindt said the officer "forced himself on [her]." When asked what she meant, Schwindt described the officer holding her arms while forcibly penetrating her. Schwindt said she did not remember how or when it ended, but the memories came back when she returned from court the morning of July 15, and then she called Maria. She said that she had fingerprints and bruises on the inside of her leg where he grabbed it. When asked about the injuries, Schwindt stated that she assumed it was a bite and that it felt like someone grabbed her skin and twisted; she also said she had bruises all over her chest— approximately six to eight bruises.

Schwindt said she had been to the jail three times total and that she was sexually assaulted by an officer during the first time. During her second time at the jail, she alleged the officer confronted her about the accusations she made about the first sexual assault. Schwindt told Detective Smith that the officer who assaulted her on July 14 was the same officer who assaulted her on her first visit to the jail. Schwindt did not know the man's name but found his picture on Facebook after the first incident. She described him as "heavyset" and "Caucasian" and said he wore his uniform. Later in the interview, Schwindt provided more details about the first assault where she alleged that the officer raped her in her room at the jail and a female officer forced her to shower afterward. Schwindt told Detective Smith that she went to the hospital after the first encounter and had an exam.

After the video of the first interview was played at trial, Detective Smith testified that Schwindt never said that she was suffering from any mental problem that would affect her ability to understand reality and that he never received any information about one during his investigation. He also did not believe she was under the influence of an intoxicating substance during the interview. Based on Schwindt's description of the perpetrator, Detective Smith identified the officer he believed Schwindt described. However, that officer was not working the night of July 14 and did not return to work until 6 a.m. on July 15—after the time Schwindt alleged the assault occurred but before she reported the alleged assault.

*Second Interview of Schwindt*

Detective Smith conducted a second interview of Schwindt on July 16, 2019, the day after the medical exam and first interview. A video of the second interview was played at trial. During the interview, Detective Smith read Schwindt her *Miranda* rights, and Schwindt expressed that she wished to speak to him. Schwindt again stated that the assault occurred between the time the lights shut off at 11 p.m. on July 14 and the following morning, but she was not sure of the exact time. Schwindt clarified that she had 8 to 10 bruises in clusters on her breasts and said she did not know whether they were from biting, sucking, or a hard pinch. Schwindt stated that she did not know how she got back to her room, what time she returned there after the assault, or if she had showered.

Detective Smith then explained that his investigation did not corroborate her account. He said the facility's video footage did not support her report, that the officer she described (and had named to Maria and in the sexual assault report she made during her first visit to the jail) was not working the day of the alleged assault. Despite pushback from the Detective, Schwindt insisted throughout the interview that she had no reason to lie and had not lied about her experience—she "believed that something happened." After

6

some back and forth, Detective Smith said, "I know it didn't happen," and Schwindt responded, "I don't know it. . . I cannot. . . I'm a rational person—I understand."

At the end of the second interview, Detective Smith told Schwindt that he was going to charge her with false reporting. Schwindt responded, "Then it didn't happen." Smith responded, "Right. . . but you're reporting that it did." Schwindt stated, "But I believed something happened to me." On cross-examination at trial, Detective Smith stated that he never saw the pictures of Schwindt's bruising nor did he get the report from the nurse that Schwindt had significant bruising.

*Further Investigation*

The State's final witness, Detective Captain Shawn McClay, who was the jail administrator for Reno County Correctional Facility in July 2019, testified that Detective Smith contacted him for the surveillance videos. Captain McClay testified that the facility had approximately 195 surveillance cameras, which captured the entire facility with very few blind spots. Captain McClay testified that he asked a deputy to go through the video and document Schwindt's activities and that he also went through all the DVDs to prepare for his testimony.

Captain McClay pointed to Schwindt's location on a floor plan of the facility and provided the timeline of Schwindt's activities from her prebooking at about 9:44 p.m. on July 13 until the morning of July 15. According to Captain McClay, the video showed Schwindt return to her room at 9:41 p.m. on July 14, and by the time two deputies conducted a headcount at 10:31 p.m. Schwindt's cell door was closed. Captain McClay testified that the next time he saw the door to Schwindt's room open on the video, it was 4:56 a.m. on the morning of July 15. Between Schwindt's return to her room at 9:41 p.m. and the next morning at 4:56 a.m., Captain McClay said he saw no one enter or exit

Schwindt's cell. He testified that he was certain there was no way there was a blind spot or that anything was missed.

Captain McClay testified that he was given the name of a potential suspect, and according to the schedule, the officer was unavailable to work on July 13 and 14, 2019, and Captain McClay recalled that the officer was on vacation. On cross-examination, Captain McClay agreed that deputies could come into the facility and use the workout room when they were not on the schedule. He explained that the workout room was in the unsecured part of the facility, separated from the secured part, and he was not aware of the identified suspect returning to the facility to workout.

The jury found Schwindt guilty of interference with law enforcement by false reporting. On August 25, 2023, the court sentenced Schwindt to an aggravated sentence of 13 months but granted presumptive probation based on her criminal history, and Schwindt ultimately received an 18-month probation term. Schwindt appealed.

DISCUSSION

On appeal, Schwindt claims the State presented insufficient evidence to convict her of interference with law enforcement by false reporting. This court reviews a defendant's challenge to the sufficiency of the evidence supporting their conviction by looking at the evidence in the most favorable light to the State "'to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). This is a high burden, and a conviction will be reversed "only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020). In this review, the appellate court does not reweigh the evidence or make credibility determinations. 312 Kan. at 247.

Schwindt was convicted of interference with law enforcement under K.S.A. 2019 Supp. 21-5904(a)(1)(B). To sustain that conviction, the State was required to prove that Schwindt falsely reported "to a law enforcement officer, law enforcement agency or state investigative agency" that a law enforcement officer "committed a crime or committed misconduct in the performance of such officer's duties, *knowing* that such information is false and intending that the officer or agency shall act in reliance upon such information." (Emphasis added.) K.S.A. 21-5904(a)(1)(B).

Schwindt contends the State failed to prove beyond a reasonable doubt that she possessed the mental culpability required under the statute—that she *knew* her allegations were false. According to Schwindt, during her first interview with Detective Smith she never showed any knowledge or awareness that her report was false. Rather, she contends the evidence demonstrates that she sincerely believed she was assaulted. Similarly, she asserts that the second interview shows her insistence that the assault happened despite Smith's pressure to rescind her allegations.

To prove the accused's guilt beyond a reasonable doubt, there must be sufficient evidence supporting each element of the crime. See *Miller v. State*, 298 Kan. 921, Syl. ¶ 5, 318 P.3d 155 (2014) ("To satisfy that burden, the State must prove each required element of the charged crime beyond a reasonable doubt."). Except as provided by statute, "a culpable mental state is an essential element of every crime defined by [the Kansas criminal code]." K.S.A. 21-5202(a). Schwindt's conviction required the State to prove she had a knowing mental state in that she *knowingly* made false statements to law enforcement. See K.S.A. 21-5904(a)(1)(B). "A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist." K.S.A. 21-5202(i). Thus, the State was required to show that Schwindt knew her sexual assault allegations against the officer were false when she reported them to law enforcement.

9

While the State must present sufficient evidence supporting each element of the charged offense—including the culpable mental state—that evidence may be circumstantial. See *State v. Hilyard*, 316 Kan. 326, 331, 515 P.3d 267. In *Hilyard*, the Kansas Supreme Court found that premeditation may be shown by circumstantial evidence, provided the inferences drawn are reasonable. 316 Kan. at 331. Moreover, "[s]ufficient evidence, even circumstantial, need not rise to such a degree of certainty that it excludes any and every other reasonable conclusion." 316 Kan. 326, Syl. ¶ 2. Although the State can rely on circumstantial evidence to prove Schwindt *knowingly* made a false report, that can present a special challenge for this court's sufficiency determination. See *State v.* Zeiner, 316 Kan. 346, 350, 515 P.3d 736 (2022) (noting that inference stacking cannot support convictions based on circumstantial evidence).

Here, there is no direct evidence that Schwindt knowingly made a false report, such as an admission to law enforcement or a friend. Fact-finders are rarely presented with such direct evidence of a defendant's culpable mental state. Schwindt does not allege that the sexual assault occurred—only that the State failed to prove she *knew* the sexual assault did not occur. When there is no direct evidence, the fact-finder may use their common knowledge and the circumstantial evidence to determine whether the State proved the defendant's culpable mental state. See *State v. Hambright*, 318 Kan. 603, 607, 545 P.3d 605 (2024) (jurors can use common meaning and common knowledge and experience when assessing witness testimony and examining evidence). Absent an allegation that Schwindt was subject to an elaborate ruse that made her mistakenly believe she was sexually assaulted, the fact-finder could apply their common knowledge that a person who was not under the influence of an intoxicating substance or suffering from a medical condition interfering with their memory or perception of reality is in a position to know whether they were sexually assaulted.

Thus, this court must determine whether a rational fact-finder applying their common knowledge to the circumstantial evidence could have found beyond a reasonable

10

doubt Schwindt knew her report was false. The Kansas Supreme Court has long held that the beyond a reasonable doubt standard need not be defined, because "[n]o definition or explanation can make any clearer what is meant by the phrase 'reasonable doubt' than that which is imparted by the words themselves." *State v. Wilson*, 281 Kan. 277, Syl. ¶ 4, 130 P.3d 48 (2006). While there is no universal definition, courts have consistently held that circumstantial evidence may be used to sufficiently prove an element beyond a reasonable doubt even when that evidence does not rise to a mathematical certainty that excludes all other possibilities. See *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Both of Detective Smith's interviews with Schwindt were video recorded and portions were played at trial. The jury viewed Schwindt's demeanor, body language, tone, mannerisms, and statements just as Detective Smith had viewed them at the time Schwindt made her allegations. Thus, the jury was able to make reasonable inferences regarding Smith's veracity and culpability at the time she made her allegations.

According to Detective Smith, Schwindt never said she was suffering from a medical condition that could affect her ability to understand reality, and he never received any information about one during his investigation. Detective Smith testified that Schwindt did not exhibit signs of being under the influence of an intoxicant and that she provided details of the allegations without any suggestions from him. Additionally, the nurse testified that she did not notice anything that caused her to be concerned that Schwindt was under the influence of an intoxicating substance. The jury was able to make credibility determinations regarding these witnesses and their assessment of Schwindt's condition at the time.

Schwindt's sexual assault report was not an off-the-cuff remark but was made to multiple people over the course of two days. First, she reported it to her friend Maria over the phone. And Maria, knowing Schwindt well, believed the report and notified law

11

enforcement. Schwindt was then taken to the hospital where she made the second report to the nurse who gave Schwindt the opportunity to anonymously report without making a law enforcement report, which Schwindt declined. Then, Schwindt made a third report— the official report to law enforcement.

During the interviews with Detective Smith, Schwindt could not recall some details but never indicated she was having difficulty grasping reality. After Detective Smith confronted Schwindt in the second interview, she denied lying about her experience. At one point, Schwindt stated, "if you say it didn't happen, then it didn't happen," but then again said that she knew what happened to her. Detective Smith stated, "there's a reason why you reported this," implying Schwindt was trying to get out of jail, and Schwindt reiterated that something happened to her. However, the State presented testimony from multiple investigating officers that Schwindt's report could not have been true based on the video footage of her in the facility.

Detective Smith testified there was nothing about Schwindt's actions that made him believe she was unable to understand the falsity of her report. While at the facility, Schwindt went through the booking process and then attended a court hearing where she showed no outward signs that she was experiencing a break from reality. In closing, the State pointed to video of Schwindt attending her virtual hearing and noted no signs of distress or memory problems, though Schwindt had told Detective Smith she was blacked out during that hearing and had no memory of it. She also reported no memory of returning to her room after the assault the evening of July 14 or getting ready for the hearing the morning of July 15.

The State argued that Schwindt's false report was made knowingly with a motive to get released or persuade Maria to bond her out of jail. Schwindt explained to Detective Smith that Maria had bonded her out in the past and that she hoped Maria would bond her out this time. In closing, the State argued that Schwindt had used this tactic in the past—

12

telling Maria someone at the facility hurt her—to get Maria to bond her out. Schwindt told Detective Smith during the first interview that she realized she had been sexually assaulted at the facility when she was on the phone with Maria following her municipal court appearance—the same phone call where she begged Maria to bond her out of the jail. Evidence of Schwindt's repeated, consistent reports, her demeanor when reporting, her alleged motive to make a false report, and the other witnesses' assessment of her intentions, could support the jury's finding that she acted knowingly when she made a false report. See *State v. Banks*, 306 Kan. 854, 858-59, 397 P.3d 1195 (2017) ("An oft-recited, longstanding maxim provides that a conviction of even the gravest offense can be based entirely on circumstantial evidence.").

Moreover, Schwindt presented no evidence contradicting or undermining the State's contention that she acted knowingly. There was no evidence that she was suffering from a medical condition interfering with her ability to know the truth of her statements or that she was under the influence of intoxicating substances. Even if, under the circumstances, the jury could have found that the State failed to prove Schwindt knew the falsity of her sexual assault report—that does not warrant reversal. Sufficient evidence to support a conclusion does not require that the evidence precludes every other possible conclusion. See *Logsdon*, 304 Kan. at 25 ("Circumstantial evidence, in order to be sufficient, 'need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.'") (quoting *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 551, 431 P.2d 518 [1967]).

CONCLUSION

Schwindt appealed her conviction for interference with law enforcement for false reporting, claiming the State failed to prove she knew the falsity of her sexual assault allegation. Although there is no direct evidence that Schwindt knew her report was false, the State presented sufficient circumstantial evidence to which a rational fact-finder—

here, the jury—could apply their common knowledge to make reasonable inferences that Schwindt knew her allegations were false.

Affirmed.